ANNA KREYLING, petitioner,

*v.*

DANIEL KREYLING, defendant.

[Decided January 6th, 1942.]

*Messrs. Hobart, Minard & Cooper* (by *Mr. Charles V. Webb, Jr.*), for the petitioner.

MATTHEWS, A. M.

This is a suit for divorce brought by the petitioner, Anna Kreyling, against the defendant, Daniel Kreyling.

The petition in this case charges the defendant with desertion through his willful, continued and obstinate refusal to have natural sexual intercourse with the petitioner for a period of two years. The defendant, although personally

served, entered no defense and the matter was heard as uncontested.

The petitioner testified that the parties were married on September 13th, 1936, by Rev. T. T. Tucker, a minister of the Gospel; that from the beginning of their married life the defendant insisted on using a contraceptive device during intercourse; that shortly after their marriage she spoke to her husband, the defendant, about having a child but he refused to have sexual intercourse without the contraceptive device which he used; that she repeatedly, over a period of three years, during which time they indulged in intercourse about twice a week, requested her husband to have natural intercourse but that he insisted on using his contraceptive device, she submitting to its use.

The evidence further shows that during the aforesaid three years the parties occupied the same bed and that they lived in an apartment in the same house in which the petitioner's parents lived upstairs.

The petitioner also testified that the defendant and she had sufficient family income, and that both she and her husband were physically healthy.

In August, 1939, because, as the petitioner testified, the constant refusal of her husband to allow her to have children was getting on her nerves, she began, what the evidence shows, was a determined and constant effort to induce her husband to have natural uncontracepted sexual intercourse with her in order that they might have a child. She said that all during the month of August, 1939, though submitting to contracepted intercourse, she kept requesting her husband for natural intercourse until finally toward the end of the month of August he told her that he would never consent to have natural intercourse with her, and that as a result of this final and definite refusal by the defendant, she had a bed brought downstairs from her mother's apartment and she set up her own separate bedroom in their own apartment, taking all of her clothing and personal effects into this separate bedroom.

The petitioner further testified that the defendant continued to occupy the bedroom formerly occupied by both of

the parties until July 3d, 1941, when he left the home, the petitioner thereupon moving upstairs to her mother's apartment; that the defendant has never since returned to his wife nor has he ever asked her to return to him; that from the end of August, 1939, to July 3d, 1941, and since then until the filing of her petition for divorce on October 22d, 1941, the defendant has never sought, by word or deed, to have sexual intercourse with the petitioner, nor has he ever indicated by word or act that he had changed or would change his mind and attitude about the matter of natural sexual intercourse, but that on the contrary, from August, 1939, until he removed from the home, he acted toward the petitioner in an unsocial manner and in every way indicated that he was adamant in his refusal to have natural sexual intercourse with the petitioner. The petitioner also testified that the only reason the defendant ever gave her for his refusal to have natural intercourse was that he did not want children because he would rather have the luxuries of life like a car every year.

The petitioner was asked by the court whether she requested her husband to have natural sexual intercourse with her after she had taken a separate bed and bedroom at the end of August, 1939, and she said "no," and she gave as her reason that she had asked the defendant so many times that she felt it would be useless to importune him further.

The petitioner further testified that she was greatly nervously distraught upon finding out in August, 1939, that her husband would never allow her to have a child by him, and as a result of her condition she consulted a doctor. The doctor was not produced in court to testify, but the married sisters of the petitioner did testify to the nervous and distraught condition of the petitioner as they observed her after August, 1939, at about which time they said the petitioner disclosed to them the fact of the defendant's refusal to ever have natural sexual intercourse with her.

When the petitioner was asked by counsel why she submitted to contracepted intercourse as long as she had submitted, she said that she did so in the hope that the defendant would discontinue the practice, but that she finally withdrew

from such intercourse in August, 1939, because she was convinced that her husband would never consent to natural intercourse.

Finally the petitioner testified that the defendant said on the occasion of a family gathering in 1939, at which the defendant's mother was present, in response to the expressed desire of defendant's mother that she would have a grandchild, that he, defendant, didn't want any children; that on another occasion during a discussion about birth control, at which petitioner's married sister, Mrs. Olga Lewis, and Mrs. Lewis' husband were present, the defendant said that his method of birth control was "fool proof."

The petitioner's married sister, Mrs. Olga Lewis, and a friend, Mrs. Mildred Middleton, corroborated the fact and date of marriage of the parties and their living arrangements prior to August, 1939, and also the fact that after August, 1939, the petitioner occupied a separate bedroom. Mrs. Lewis also testified that the petitioner was upset after August, 1939, at about which time the petitioner confided to Mrs. Lewis the fact of the defendant's refusal to ever have natural intercourse with the petitioner, and that it was shortly after the petitioner thus confided in Mrs. Lewis that the petitioner took up separate sleeping quarters.

Mrs. Lewis further testified that the defendant had told her and her husband that he did not want children of his own, that children were nice but that he didn't want to be burdened with them. She likewise corroborated the petitioner's testimony about the family gathering at which the defendant's mother expressed the desire that she have grandchildren, whereupon the defendant said that he and his wife were not going to have any children, that he didn't want any children. Also Mrs. Lewis corroborated the petitioner's testimony about the occasion when birth control was being discussed between the defendant and Mr. and Mrs. Lewis, the petitioner being present on this occasion, Mrs. Lewis had spoken of a new method of birth control described in a booklet of some Birth Control League, whereupon the defendant said that he wasn't interested in any other method than the one he used because his method was "fool proof." Mrs.

Lewis also testified that the defendant made no secret of his practice of birth control and that he discussed it in the presence of his mother and others.

Mrs. Mildred Middleton, a friend of the petitioner, corroborated the petitioner's testimony as to the living arrangements of the parties prior and subsequent to August, 1939. She also testified about an occasion when the defendant was driving Mr. and Mrs. Middleton home after an evening out, at which time Mrs. Middleton expressed concern about her child whom she had left in someone's care during her absence, whereupon the defendant said that he would never have to worry about children because he and his wife would never have any children. Mrs. Middleton also corroborated the unsocial attitude of the defendant toward the petitioner subsequent to August, 1939.

In arriving at a decision in this case I have not only considered all of the testimony but also the fact that the defendant has failed to file an answer to the petition or to appear to contest or deny any of its allegations, which are very specific as to the details of the defendant's continued refusal of natural intercourse with the petitioner. I have also considered what has been aptly called in such cases "the atmosphere of the case" as well as the appearance, demeanor and attitude of the petitioner and her witnesses on the witness stand. The witnesses and the petitioner appeared entirely worthy of credence and there appeared not the slightest tinge of collusion in the case.

The question to be decided in this case is, as far as I have been able to determine, one of novel impression in our state, namely, is the unjustified refusal by the defendant of natural sexual intercourse, persisted in willfully, obstinately and continually for a period of two years, for the purpose of preventing the petitioner from giving birth to a child, a ground for divorce for the cause of desertion, both parties being physically capable of having natural uncontracepted intercourse.

Our Court of Errors and Appeals has held in the case of *Rains* v. *Rains, 127 N. J. Eq. 328; 12 Atl. Rep. (2d) 857:* "It is well established in this state that unjustified refusal

of sexual intercourse persisted in willfully, obstinately and continually for a period of two years is a ground for divorce for the cause of desertion, which rule is laid down in the case of *Parmly* v. *Parmly, 90 N. J. Eq. 490; 106 Atl. Rep. 456,* and *Raymond* v. *Raymond, 79 Atl. Rep. 430.*"

It will be noted that in the case of *Rains* v. *Rains, supra,* and in the cases cited by the Court of Errors and Appeals in its decision in the *Rains Case,* that there was an absolute refusal by the defendant of any sexual intercourse. In the case *sub judice* there was a refusal of natural sexual intercourse, the defendant insisting upon contraceptive intercourse. And while it is a fact that the *Raymond Case* was decided before birth control had become widely known and practiced, nevertheless the fact that the Court of Errors and Appeals in *Rains* v. *Rains, supra,* decided April 25th, 1940, cites the *Raymond Case,* is indicative that our court of last resort considers the legal reasoning and philosophy upon which the *Raymond Case* was decided as the basis for its reiteration of the *Rains Case* of what the court called the established rule as to the unjustified refusal of sexual intercourse laid down in the *Raymond Case.*

In *Raymond* v. *Raymond, supra* (at *p. 431*) the court said:

"The controlling purpose of marriage is to enable the sexes to gratify lawfully the natural desire for procreation which has been implanted in them, that the race may be preserved upon the earth."

Moreover this same fundamental principle finds expression in these words of our late Chancellor Walker in his decision in the case of *Turney* v. *Avery, 92 N. J. Eq. 473; 113 Atl. Rep. 710:*

"Lord Penzance has observed that the procreation of children is one of the ends of marriage. * * * I do not hesitate to say that it is the most important object of matrimony for without it the human race itself would perish from the earth."

Likewise in the case of *Davis* v. *Davis, 90 N. J. Eq. 158; 106 Atl. Rep. 644,* the court says:

"Procreation if not the sole, is at least an important reason for the existence of the marriage relation. *Raymond* v. *Raymond, 79 Atl. Rep. 420; Rector* v. *Rector, 78 N. J. Eq. 386.*"

Now in the case of *Rains* v. *Rains, supra,* the defendant refused to have any sexual intercourse with the petitioner because he said he had a "germ" and didn't want her to become a mother. In the case *sub judice* the defendant did not want the petitioner to become a mother because he preferred what he called "the luxuries of life" to children, and he accomplished his purpose of not wanting the petitioner to become a mother not by refusing his wife any sexual intercourse, but by using a contraceptive device. Certainly the result of the defendant's conduct in the instant case was the same as the result of the defendant's refusal to have any intercourse in the *Rains Case.* The defendant in the case *sub judice* apparently regarded the married state as mere licensed concubinage and not a relation "the controlling purpose" of which, is "to enable the sexes to gratify lawfully the natural desire for procreation which has been implanted in them that the race may be preserved upon the earth."

Moreover I think it may be said that in all of the cases in our state which lay down and follow the rule that unjustified refusal of sexual intercourse for the statutory period is a ground for divorce for the cause of desertion, the decisions rest on the principle that refusal of sexual intercourse prevents the procreation of children and thereby deprives marriage of what the late Chancellor Walker in *Turney* v. *Avery, supra,* called its "most important object." As Charles V. Webb, Jr., Esq., for Hobart, Minard & Cooper, solicitors for the petitioner in the instant case, said in his brief filed before trial: "It has never been held nor has it ever been suggested that either party may enter into a contract of marriage merely to legalize the performance of an act which without the marital status would be illegal. Such a construction would be tantamount to the establishment of legalized fornication."

Married persons in normal health are, by the contract and "controlling purpose" of marriage, entitled to "gratify lawfully the natural desire for procreation which has been implanted in the sexes that the race may be preserved upon

the earth." In the ecclesiastical terminology of the law in olden days, marital sexual intercourse was called the *"debitum,"* the debt owed by husband and wife, each to the other.

Prescinding, however, from all except bare legal considerations, we must recognize the modern fact that contraception to prevent or to space the birth of children for alleged therapeutic, economic, and what are modernly called "social" reasons and conveniences, is a widely accepted practice to-day. Erstwhile statutory prohibitions of the sale and use of contraceptive devices, medical or otherwise, for birth prevention and birth control, and the dissemination of information about birth prevention and birth control have been more or less removed in many jurisdictions. In jurisdictions where there are statutory prohibitions against the dissemination of such information and the purveying of contraceptive devices, such prohibitions are often more obeyed in their breach than in their observance.

Where both husband and wife willingly indulge in birth prevention no legal problem arises, the matter being solely one for the individual consciences of the parties, honestly formed according to their religious and moral beliefs. Where, however, as the evidence in the instant case shows, one of the parties, the defendant, solely for his own personal selfish convenience, or, as he puts it, so that he may enjoy the luxuries of life, insists upon contraception to prevent his wife from becoming a mother, he being the active agent in the use of the contraceptive device over her continued protests and against her will, it must be said that such conduct persisted in willfully, obstinately and continually for two years is cause for divorce on the ground of desertion.

It is unthinkable that a wife, as in this case, in full health, her maternal instinct clamoring, as the evidence shows, for the realization of her desire to become a mother, may, because of the selfishness of her husband be condemned during her marriage to him to a life of frustration of that maternal instinct and desire, with all of the deleterious physical, emotional and mental effects that follow such frustration. Such conduct by a husband is a violation of both human and Divine law.

. Nor does the fact that the petitioner did not, after she left the defendant's bed in August, 1939, seek further to request or persuade him to have natural sexual intercourse with her, indicate a failure of proof of defendant's obstinacy. All of the evidence, including the statements by the defendant that he and his wife would never have a child, as well as his continued refusals to have natural intercourse with the petitioner from the very beginning of their married life, refusals culminating in his statement to the petitioner in August, 1939, that he would never indulge in natural uncontracepted intercourse with her, warranted the petitioner's statement that she finally realized, at the end of August, the absolute futility of any further requests. Moreover, I think it may be said that there are reasonable limits beyond which a wife or a husband need not go, in self-respect, in seeking such intimate relations. Under all of the evidence, I consider that the petitioner fulfilled her legal duty in this respect.

I will advise a decree of divorce for the petitioner on the ground that under the evidence the unjustified, willful, obstinate, continual refusal of the defendant over a period of two years to have natural uncontracepted intercourse with the petitioner in order to prevent her from having a child constitutes a desertion of the petitioner by the defendant.