**Paula POE et al., and all others similarly situated, Plaintiffs-Appellees,**

v.

**Richard E. GERSTEIN, etc., et al., etc., Defendants-Appellants.**

**No. 74–2745.**

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1975.

---

788

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., J. Robert Olian, Asst. Atty. Gen., Chief Counsel, Miami, Fla., for defendants-appellants.

Roy Lucas, Washington, D. C., Joseph P. Farina, Miami Shores, Fla., for plaintiffs-appellees.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The state of Florida appeals the judgment of a three-judge district court which declared Fla.Stat.Ann. § 458.22(3) (Supp.1975–76) unconstitutional. We agree that the statute is unconstitutional and we therefore affirm the judgment below.

## I.

A pregnant married woman, a pregnant minor (referred to in this litigation by the pseudonyms "Nancy Coe" and "Patricia Noe" respectively), and a physician, Dr. Lynn P. Carmichael, filed a complaint in the United States District Court for the Southern District of Florida challenging the constitutionality of two provisions of the Florida Therapeutic Abortion Act, Fla.Stat.Ann. § 458.-22(3) (Supp.1975–76). The plaintiffs sought declaratory and injunctive relief.

In order to receive an abortion in the state of Florida, the statute in question requires:

(a) The written request of the pregnant woman and, if she is married, the written consent of her husband, unless the husband is voluntarily living apart from the wife, or

(b) If the pregnant woman is under eighteen years of age and unmarried, in addition to her request, the written consent of her parent, custodian, or legal guardian must be obtained.

A three-judge district court was convened. In an opinion dated August 13, 1973, the court entered declaratory judgment holding both sections of the statute unconstitutional. *Coe v. Gerstein*, 376 F.Supp. 695 (S.D.Fla.1973). However, the court did not grant injunctive relief because it anticipated that the state would respect the declaratory judgment. *Id.* at 699.

The state of Florida appealed the declaratory judgment directly to the Supreme Court; plaintiffs below also appealed, contesting the district court's refusal to issue an injunction. The state's appeal was dismissed for want of jurisdiction, the Court advising that the declaratory judgment was appealable to the court of appeals, *Gerstein v. Coe*, 417 U.S. 279, 94 S.Ct. 2246, 41 L.Ed.2d 68 (1974), and the district court's refusal to grant an injunction was affirmed, *Poe v. Gerstein*, 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974).

The state's appeal of the district court's declaratory judgment is now before this court.

## II.

*Roe v. Wade*, 410 U.S. 113, 153–56, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) held, of course, that the woman's right to an abortion is a "fundamental right," which may be limited only when state interests become "compelling." However, since the Court in that case specifically reserved judgment on the constitutionality of parental consent requirements,[1] *id.* at 165, n. 67, 93 S.Ct. 705, we must begin our inquiry as to the constitutionality of the parental consent requirement by assessing the applicability of this fundamental right to minors.

At common law, minors were charges of the family and state, legally unable to act for themselves. *See In re Gault*, 387 U.S. 1, 17, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The law did not distinguish between the infant and the mature teenager, treating them both as the property of their parents, who could make all decisions affecting them. *See* Family Planning, Contraception and Voluntary Sterilization: An Analysis of Laws and Policies in the United States, Each State and Jurisdiction 70 (Department of Health, Education & Welfare, Pub. No. (HSA) 74–16001, 1974).

In recent years, the Supreme Court has, at least partially, repudiated this view. Proclaiming that "[n]either the Fourteenth Amendment nor the Bill of Rights is for adults alone," *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18

---

1. In holding that termination of pregnancy may be effected during the first trimester without state interference, the Court's opinion could be interpreted as barring any state interference with the woman's right. *See* 410 U.S. at 163, 93 S.Ct. 705. However, since the Court specifically eschewed discussion of parental and paternal consent requirements, *see* 410 U.S. at 165, n. 67, 93 S.Ct. 705, the rights of neither the parents nor the husband were before the Court, and, consequently, we believe the status of these types of consent requirements remained an open question after *Roe.*

L.Ed.2d 527 (1967), the Court has concluded that at least some minors are "persons" under the Constitution, and, hence, "possessed of fundamental rights which the State must respect." *See Tinker v. Des Moines Community School Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969).

In spite of these rather broad proclamations, the Court has specifically extended only certain first amendment,[2] due process,[3] and equal protection rights[4] to minors, addressing these issues primarily in the contexts of the educational system and juvenile court proceedings. Moreover, the Court has often noted that the state's authority over children's activities is broader than over like actions of adults. *See, e. g., Ginsberg v. New York*, 390 U.S. 629, 636, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645 (1944). In *Ginsberg*, for example, the Court permitted the state to prohibit children from viewing material to which an adult would have a constitutional right. And in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Court refused to extend the right of jury trial to the adjudicative phase of state juvenile court delinquency proceedings, despite the acknowledgement that "trial by jury in criminal cases is fundamental to the American scheme of justice." *Id.* at 540, 91 S.Ct. at 1984.

In none of the cases involving minors' rights has the Court proposed a universal analytical framework for the evaluation of the minor's claim. In fact, on at least two occasions, the Court has specifically refused to consider the "totality of the relationship of the minor and the State." *See Ginsberg v. New York*, 390 U.S. 629, 636, 88 S.Ct. 1274, 1279, 20 L.Ed.2d 195 (1968); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). As a result, it is possible that either: (1) all fundamental rights apply to minors, but the state may sometimes assert an interest sufficient to justify the state action; or (2) minors do not necessarily have all of the fundamental rights of adults.[5]

We do not choose between these competing rationales because the Court has consistently adhered to a case by case approach—carefully limiting its language and holding to the facts before it—in adjudicating minors' rights. We therefore must look to the nature of the right itself in order to determine its availability to minors. In *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court said that the Constitution guarantees a zone of privacy, but only "fundamental" rights are included within this constitutional guarantee of personal privacy. The Court then concluded that the right of privacy includes the right to an abortion, apparently because of the harm that would occur as a result of its denial:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's

**2.** *See Tinker v. Des Moines Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

**3.** *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

**4.** *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Brown v. Board of Edu-*

*cation*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**5.** The Supreme Court of Washington reached the former conclusion in *Washington v. Koome*, 84 Wash.2d 901, 530 P.2d 260 (1975) in which it declared the state statute requiring parental consent unconstitutional. *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), however, would seem to suggest a contrary conclusion with regard to a minor's fundamental rights, and the court in *Foe v. Vanderhoof*, 389 F.Supp. 947, 953 (D.Colo.1975) adopted this position.

decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation. *Id.* at 153, 93 S.Ct. at 727.

While the Court has not spoken with regard to a minor's privacy rights, application of the standard enunciated by the Court in *Roe*—the need for the right and the dire consequences of its denial—would certainly dictate the availability of the right to minors. Indeed, it would appear that all of the criteria of *Roe* apply with even greater force to an unwed pregnant minor: teenage motherhood involves serious consequences including adverse physical and psychological effects upon the minor and her children, the stigma of unwed motherhood, impairment of educational opportunities caused by the need to drop out of school, and numerous other social dislocations.[6] The magnitude of the minor's interest in avoiding these consequences suggests that the developmental differences between adults and minors do not warrant denying constitutional protection to the minor's abortions.

■ We therefore believe that the fundamental right to an abortion applies to minors as well as adults. This indicates only that the precise holding of *Roe v. Wade* would apply with equal force to minors as well as adults. However, in this case the state relies upon altogether different interests than it did in *Roe,* and the applicability of that case, therefore, does not necessarily mean that the state cannot enforce parental choices with regard to minors' abortion decisions. Despite the numerous First and Fourteenth Amendment cases, the Supreme Court has yet to decide whether the state may vest the parent with authority to deny his children certain rights. In the cases involving childrens' rights cited heretofore, there has been an express or implied unity of interests between the parent and child, or the consequences of disparate interests were not at issue.

■ Where fundamental rights are involved, "regulations limiting these rights may be justified only by a 'compelling state interest,'" and "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973) (citations omitted). More precisely, in early fundamental rights cases, the Court sought a "rational relationship between the state statute and a compelling state interest," *see, e. g., Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), while later cases required that an enactment be "necessary" to achieve a compelling state interest.[7]

---

6. *See e. g.,* Stern, Furnishing Information and Medical Treatment to Minors for Prevention, Termination and Treatment of Pregnancy, 5 Clearinghouse Rev. 131; Pilpel & Wechsler, Birth Control, Teenagers and the Law, 1 Fam. Planning Perspectives 29 (1969); Note, Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy, 88 Harv.L.Rev. 1001, 1010 (1975); Note, The Minor's Right to Abortion and the Requirement of Parental Consent, 60 Va.L.Rev. 305, 308 (1974).

7. *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School Dist.,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In *Dunn,* the Court required the state to show that there were no "alternative means" to achieve the state's goal without infringing upon constitutionally protected activity.

■ In response, the state could arguably rely upon four interests to defend the statute:[8] (a) preventing illicit sexual conduct among minors; (b) protecting minors from their own improvidence; (c) fostering parental control; (d) supporting the family as a social unit. Although some of these interests are extremely important, we do not believe that any bears the relationship to the minor's right necessary to overcome it.

■ The state in this case does not specifically claim deterrence of illicit teenage sexual conduct as a compelling state interest. Indeed, *Roe v. Wade* —if only by omission—clearly indicates that the state interest in deterring illicit sexual conduct among adults would not justify restricting the right of abortion. Without further commenting upon the extent to which the state can legislate in order to foster a particular moral climate, we readily acknowledge that the state has "an independent interest in the well-being of its youth." *Ginsberg v. New York,* 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968); *see Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 88 L.Ed. 645 (1944). But while the state may have a greater interest in controlling teenage sexual activity, the relationship between this interest and the statute is attenuated at best. The state's ability to legislate directly against illicit teenage sexual activity demonstrates that this statute is not "necessary" to achieve a compelling state interest, and, hence, constitutionally infirm under the test for "fundamental rights." *See Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Kramer v. Union Free School Dist.,* 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Moreover, there is no evidence that a statute of this type would significantly affect illicit sexual conduct among minors.[9] Finally, the fact that Florida law allows a physician to prescribe contraceptives for any unmarried minor who "[m]ay, in the opinion of the physician, suffer probable health hazards if such services are not provided . .," Fla.Stat.Ann. § 381.382 (1973), establishes that the deterrence of teenage sexual conduct is not a rational or reasonable purpose of the statute. *See Eisenstadt v. Baird,* 405 U.S. 438, 449, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

In its argument before us, the state predictably asserted an interest in protecting the minor from her own improvidence as a justification for the statute. If the state is only concerned about the minor who is mentally incapable of making a reasonable decision, logic would dictate an exception in the statute for the mentally mature minor. At any rate, state intervention into the affairs of minors is usually justified on the ground that it is in the child's best interest. *See* Note, State Intrusion into Family Affairs: Justifications and Limitations, 26 Stan.L.Rev. 1383, 1390–91 (1974). This statute indicates that the state is interested in the quality of the abortion decision-making process, particularly since neither this court nor the state has any criteria by which to judge the quality of the abortion decision itself. Presumably, the state is attempting to bring greater wisdom and experience into the decision-making process, but the efficacy of the manner by which the state purports to accomplish this aim is questionable.

If a minor contacts a physician merely to perform the operation, there is no need of additional information in order

---

8. The precise justification which the state relied upon in its brief and oral argument are unclear. The state's argument appears to rely upon a hybrid of several of the interests in the text. We have chosen to distill these interests in order to more adequately analyze them.

9. Legislative prohibitions on the availability of contraceptives to minors do not alter sexual activities or attitudes. *See* Pilpel & Wechsler, Birth Control, Teenagers and the Law: A New Look, 3 Fam. Planning Perspectives 37 (1971); Note, Parental Consent Requirements and the Privacy Rights of Minors: The Contraceptive Controversy, 88 Harv.L.Rev. 1001, 1010–11. The record in this case also indicates that extensive numbers of Florida minors became pregnant and sought abortions during the period prior to *Roe v. Wade,* when Florida had a quite restrictive abortion law.

to make a decision, since a decision has already been made; at most the state could argue that a different result would occur if the parent rather than the child made the decision. Similarly, if a minor consults a physician in order to decide whether to have an abortion, the physician is in a position to counsel the minor as to the physical—and perhaps mental—consequences of her decision. In either case, the ability of the parent to improve the "quality" of the abortion decision is questionable, for the ameliorative qualities of a third person's wisdom and experience in this decision are uncertain. Moreover, there is no reason to expect the parents to always act in the child's best interest; numerous cases have noted parents refusing operations on their children for nonsensical or even punitive reasons.[10] At the very least, the statute would more narrowly achieve the state's result if it called for parental "consultation" rather than permission prior to abortion.[11] For all these reasons, the statute in question is not drawn with sufficient particularity to express only the state interests at stake. See *Roe v. Wade*, 410 U.S. 113, 115, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and cases cited therein.

Fostering parental control is also a possible justification for the statute. Cases have indicated that parents have considerable authority over their children,[12] but this authority is not unlimited.[13] We agree, of course, that parental control (that is, the continuing ability of the parent to direct the maturing minor's decisions) is important to the stability of society, but we do not believe that this justification satisfies the constitutional standard.

First, we have some difficulty accepting parental control as a compelling state interest in the context of this statute. This formulation of the state's interest indicates that the parents may prohibit their daughter's abortion for reasons other than the minor's best interests. As a result parents would be able to overcome their daughter's fundamental rights for insubstantial personal reasons of their own. The result is particularly troublesome in light of the fact that if the pregnancy continues to term, the minor, rather than her parents, would be legally responsible for the newborn child. See Fla.Stat.Ann. § 744.13 (Supp.1975–76); § 827.06 (Supp.1975–1976).

Second, we do not believe that the statute is "necessary to the achievement" of the state interests. See *Kramer v. Union Free School Dist.*, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The fact that the minor became pregnant and sought an abortion con-

---

**10.** *See e. g., Baird v. Bellotti*, 393 F.Supp. 847 (D.C.Mass.1975) (the court found that some parents would insist upon the continuation of their daughter's pregnancy simply as a punishment); *In re Rotkowitz*, 175 Misc. 948, 949, 25 N.Y.S.2d 624, 626 (Dom.Rel.Ct.1941): "There are parents . . . who because of ignorance or prejudice or neglect, and sometimes even viciousness, are either incapable or unwilling to do the things necessary for the protection of their own offspring. There are parents who will by act do that which is harmful to the child and sometimes will fail to do that which is necessary to permit a child to be prepared to lead a normal life in the community." The record before us even indicates that one of the plaintiffs filed suit because her parents threatened to "send her away" if she became pregnant.

**11.** We do not mean to intimate, by our example of a more narrowly drawn alternative, that such a parental consultation statute would necessarily pass constitutional muster. The record before us, in fact, indicates that merely facing one's parents with the problem of unwanted pregnancy would present a considerable deterrent to abortion among teenage girls and, in fact, may adversely affect their mental and physical health and thereby arguably infringe upon the minor's constitutional rights.

**12.** *See Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

**13.** *See, e. g., Wisconsin v. Yoder*, 406 U.S. 205, 243–246, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (Douglas, J., dissenting in part); *Rowan v. United States Post Office*, 397 U.S. 728, 741, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (Brennan, J., concurring); *McBride v. Jacobs*, 101 U.S. App.D.C. 189, 247 F.2d 595 (1957) (indicating that parent may waive child's right of counsel only if there is no conflict of interest).

trary to the parents' wishes indicates that whatever control the parent once had over the minor has diminished, if not evaporated entirely. And we believe that enforcing a single, albeit important, parental decision—at a time when the minor is near to majority status—by an instrument as blunt as a state statute is extremely unlikely to restore parental control.

Finally, the state could choose to support the parent's decision in order to reinforce and maintain the family as a social unit. We must therefore decide whether the state's interest in maintaining the family structure is stronger than the minor's fundamental right to abortion, and whether enforcing parental prohibition against abortion is "necessary" to further this interest.

There are, of course, incontrovertible state and parental interests in maintaining the family structure, since this structure provides countless social benefits.[14] In most cases, we believe that the state's support of parental decision-making promotes both the state's and the parents' interests in preserving the family unit. See Note, supra n. 6, 88 Harv.L.Rev. at 1016. However, in the abortion context the requirement of parental permission is unlikely to achieve the state's aim of insuring the preservation of the family. If a minor's pregnancy has fractured the family structure, imposition of a parental prohibition of abortion cannot reasonably be expected to restore the family's viability as a unit.

■ Moreover, while the privacy of the family is constitutionally protected,[15] this protection can be justified as much by first amendment associational value[16] as by "the inherent rights of parents."

These associational values exist not merely to protect parental authority, but also to preserve the intimacy and autonomy of the family relationship from state intrusion. Thus, enforcing parental control is not "necessary" to maintain the integrity of the family unit; in fact, the integrity of the family structure could best be maintained without state encroachment upon the minor's fundamental right to abortion, if the state refrained from interfering with the family decision-making processes at all. The absence of a parental consent requirement would not portend the lack of parental input into the minor's abortion decision. Rather, in the absence of the statutory requirement, the family will resolve the problem in the manner by which the minor's problems are generally resolved: where the parent-child relationship is strong, the parent will have a great deal of input into the abortion decision; where the parent-child relationship has broken down, the parents will have less direct input. In any case, we believe that the importance of intrafamilial relationship and family privacy is sufficient to outweigh the state's interest in the enforcement of the parental prohibition.

In sum, none of the possible justifications for the parental consent requirement can meet the standard employed by Roe v. Wade, 410 U.S. at 155, 93 S.Ct. 705, and the cases upon which it relies. Consequently, we affirm the lower court's holding that the parental consent requirement is unconstitutional.

## IV.

The state asserts two justifications for the spousal consent requirement of the

---

14. The importance of the family unit is evidenced by the Supreme Court's efforts to preserve family autonomy from state intrusion. See Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 3? L.Ed.2d 15 (1972).

15. See Paris Adult Theater I v. Slaton, 413 U.S. 49, 66, n.13, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

16. See Griswold v. Connecticut, 381 U.S. 479, 483–84, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Tribe, The Supreme Court, 1972 Term, Foreword: Toward a Model of Roles in the Due Process of Life and Law, 87 Harv.L.Rev. 1, 34–38 (1973).

Florida statute. First, the state defends the statute as incidental to its general authority to regulate the marriage relationship. Second, the state contends that the statute is necessary to protect the rights of a husband whose wife desires an abortion.

■ The state's interest in the stability of society and the well-being of its citizens justifies its power to regulate certain aspects of the marriage relationship. *See Estin v. Estin,* 334 U.S. 541, 546, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948); *Reynolds v. United States,* 98 U.S. 145, 165, 25 L.Ed. 244 (1878). These powers include, for example, the ability to regulate the method by which one becomes married or divorced. *See Maynard v. Hill,* 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888); *Crouch v. Crouch,* 28 Cal.2d 243, 169 P.2d 897 (1946). However, without attempting to fully delineate the state's powers with regard to the marriage relationship, we believe that the state's societal interests do not justify its intrusion into all aspects of the marriage relationship. *See Griswold v. Connecticut,* 381 U.S. 479, 482, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); 495–499, 85 S.Ct. 1678 (Goldberg, J., concurring). We know of no case which has sanctioned state determination of intrafamilial decision-making processes with regard to childbearing decisions. *See Griswold v. Connecticut, supra,* 381 U.S. at 482, 485, 85 S.Ct. 1678; 495–499, 85 S.Ct. 1678 (Goldberg, J., concurring). Moreover, *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 34 (1972) specifically held that the married person's right of privacy included the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." We therefore believe that the state's societal interest in this aspect of the marriage relationship is not sufficiently "compelling" to justify the statute.

■ The state's interest in protecting the husband's rights appears to be more substantial, and the consent requirement might arguably be necessary to achieve the protection of these interests. A husband and father has two interests which might be endangered by his wife's abortion: an interest in the fetus with which his wife is currently pregnant and an interest in the procreation potential of his marriage.

The husband's interest in the fetus with which his wife is pregnant is exceedingly difficult to evaluate. The common law recognized no rights of the father in the fetus,[17] and neither the criminal law nor tort law has been particularly concerned with protecting the father's interest in the fetus.[18] However, until relatively recently, abortions were available in only the most limited circumstances. Therefore, the father's interest did not require specific protection, or even recognition, since any interest the father had was not of sufficient magnitude to prohibit an abortion in those rare circumstances in which it was permissible—for example, if continuing the pregnancy would have presented an imminent danger to the woman's life. And, in fact, as abortions became more readily available, and, hence, the need to protect the father's interest arose, many legislatures acted accordingly by enacting statutes similar to the one before us.

The husband's interest would most logically emanate from his paternity of the fetus, and thus appear analytically as a precursor of the father's relational interest in his child. Indeed, the Supreme Court has demonstrated that even an unwed father has, in certain circumstances, rights to the custody of his children—but, perhaps, only when he has established a family relationship with

---

17. In fact, the common law recognized no recovery for tortious injury to the fetus at all. *See, e. g., Stidam v. Ashmore,* 109 Ohio App. 431, 167 N.E.2d 106 (1959); *Dietrich v. Inhabitants of Northampton,* 138 Mass. 14 (1884).

18. *See* Note, Abortion: The Father's Rights, 42 Cincinnati L.Rev. 441, 442–44 (1973).

them. *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). At any rate, it is clear that the husband may establish a greater right than that of the wife to custody of the children upon dissolution of the marriage. *See, e. g., Vanderlaan v. Vanderlaan,* 9 Ill.App.3d 260, 292 N.E.2d 145 (Ill.1972).

However, the limited, yet expanding, recognition of paternal interests in the children which a father has sired by no means disposes of this case. Among the difficulties with this analogy is the statutory requirement, present here, that the woman secure consent from the man who is her husband at the time she desires the abortion. There is no requirement that the husband sire the fetus nor even that the woman be married, at the time of conception, to the same man whose consent is later required for the abortion. The statute therefore seems to base the husband's interests upon his marriage to the woman rather than his paternity of the fetus. As a consequence, the rights of the husband which arguably spring from his interest in the fetus are of doubtful applicability in this case.[19]

■ There is, of course, a more fundamental reason for our conclusion that the father's interest in the fetus is not sufficiently weighty to prevent the exercise of the woman's fundamental right. Since the fetus is not a person, *Roe v. Wade,* 410 U.S. at 156–158, 93 S.Ct. 705, neither is it a "child." A fortiori, the father's interest in the fetus is not of equal importance with his interest in children with whom he has a familial relationship. While the father may be able to mitigate—but only to some extent—post partum effects upon an unwilling mother, *see Roe v. Wade,* 410 U.S. at 153, 93 S.Ct. 705, we do not believe his interest in the fetus is of sufficient weight to force the woman to face the mental and physical dangers of pregnancy and childbirth. Moreover, we believe that the state interest in the husband's interest in the fetus is simply too attenuated to strip the woman of her fundamental right to privacy.[20]

■ The husband also has a strong interest in the procreative potential of his marriage. Of course, the procreation of offspring is a fundamental right. *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). By legislating against procreation outside the marriage relationship, the state has the power to make a man totally dependent upon his wife for legitimate offspring. Since the woman, by repeatedly having abortions, prevents a man from procreating offspring within the marriage relationship, an infringement of his fundamental right to a family, *see Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), has arguably occurred. Moreover, since procreation of offspring could be considered one of the major purposes of marriage, *see e. g., Kreyling v. Kreyling,* 20 N.J.Misc. 52, 23 A.2d 800 (1942), the state asserts the need to intervene in the abortion decision-making process in order to protect the husband's interest in his procreative and family rights.

The fact that both procreation and abortion have been held to be fundamental rights is understandably confusing. In *Roe v. Wade,* the Supreme Court held that the right to abortion is a very personal right exercised by the woman as an individual. Moreover, on a practical level, that right may be exercised without a partner. The Court first asserted the fundamental nature of procreative

19. The law regulating adoption procedures also provides no analogical insights. While most states require both legitimate parents to give their consent before their child can be adopted by others, neither parent can force custody of the child on the unwilling marital partner. *See* Note, *supra* n. 18 at 456. Here, the father would be forcing the mother to care for the fetus for nine months.

20. Indeed, this spousal consent statute, when read in the context of the entire Florida statute, is so inflexible that it denies a woman an abortion in circumstances in which she would have had this constitutional right even before *Roe v. Wade. See United States v. Vuitch,* 305 F.Supp. 1032 (D.D.C.1969); *People v. Belous,* 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969).

rights when protecting those rights from state infringement. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Although *Skinner* protected the individual's procreative rights, in practical terms these rights cannot be exercised alone. Hence, even without state interference, the right becomes meaningless in the absence of a willing partner. *Skinner,* therefore, did not guarantee the individual a procreative opportunity; it merely safeguarded his procreative potential from state infringement. As a consequence, we do not read *Skinner* to permit state infringement upon the woman's fundamental right to abortion.

In any case, the state may secure the man's procreative rights by merely making unconsented abortion a ground for divorce.[21] The man may then enter into a new marriage relationship and the state may thereby protect his procreative interests without infringing upon the former wife's right to abortion.

For the reasons set forth above, the decision of the district court is

Affirmed.

---

**21.** *Cf. Kreyling v. Kreyling,* 20 N.J.Misc. 52, 23 A.2d 800 (1942). A woman was granted a divorce on the ground that her husband's refusal to participate in uncontracepted intercourse was constructive desertion. The court found that the husband's conduct frustrated one of the major purposes of marriage.