The PEOPLE of the State of Colorado
In the Interest of S. P. B., Child.

Upon the Petition of C. F. B.,
Petitioner-Appellee,

and Concerning P. D. G.,
Respondent-Appellant.

No. 81SA110.

Supreme Court of Colorado.

Oct. 12, 1982.

Margaret E. Gregory, Deputy Dist. Atty., Colorado Springs, for petitioner-appellee.

D. Morgan Dilling, Colorado Springs, for respondent-appellant.

DUBOFSKY, Justice.

P. D. G., the natural father of S. P. B., appeals a child support order of the El Paso County District Court.[1] P. D. G. questions whether the constitutional rights to due process and equal protection of the laws under the state[2] and federal constitutions are violated by the Uniform Parentage Act (UPA), section 19–6–101, *et seq.,* C.R.S.1973 (1978 Repl. Vol. 8), which imposes the duty of child support upon both parents without according the father a right either to decide that the fetus should be aborted or to later avoid child support obligations by showing that he offered to pay for an abortion. We hold that neither equal protection nor due process is offended by the statutory scheme and affirm the judgment of the district court.

The issue underlying this appeal arose in the course of a proceeding to determine the paternity of and support for S. P. B., a child. The respondent-appellant P. D. G. admitted to paternity of S. P. B. but denied

any obligation to support the child. P. D. G. and the child's mother, C. F. B., have never married and are not presently living together. P. D. G. asserts that when C. F. B. informed him that she was pregnant, he responded that he did not want her to have the baby and offered to pay for an abortion. P. D. G. claims that this exchange took place within the first trimester of C. F. B.'s pregnancy. C. F. B. did not agree to an abortion and subsequently gave birth to S. P. B. C. F. B. has had custody of S. P. B. since birth.

The appellant argues that the statutory imposition of the duty of child support upon both parents without granting the father the right to decide whether to terminate the pregnancy violates his right to equal protection of the laws under the federal constitution, *U.S.Const.* Amend. XIV, and under the state constitution, *Colo.Const.* Art. II, § 25.[3] The appellant further argues that the statute creates a presumption which, consistent with due process, he should have an opportunity to rebut. Specifically, the appellant contends that the availability of legalized abortion, combined with C. F. B.'s decision to have the child against his wishes, serves as an "intervening factor" which breaks the nexus between himself and the child and which extinguishes his obligation to support it. The district court rejected these arguments and ordered P. D. G. to pay child support in the amount of $150 per month and one-half of the birth expenses of the child.[4]

At the outset it is important to point out what is not at issue here. There is no

1. This case was transferred here from the Court of Appeals under sections 13–4–110(1)(a) and 13–4–102(1)(b), C.R.S.1973 because it involved a constitutional question.

2. Equal protection of the laws is a constitutionally recognized right included within the due process clause of Article II, § 25 of the Colorado Constitution. *See Vanderhoof v. People,* 152 Colo. 147, 380 P.2d 903 (1963).

3. The appellant's challenge at trial was based upon due process. His theory on appeal is predicated upon equal protection. Because the two protections are found in the same clause of the Colorado Constitution (see footnote 2, *su-*

*pra* ) and overlap in constitutional analysis generally, we consider both theories here.

4. The UPA, section 19–6–116, C.R.S.1973 (1978 Repl. Vol. 8) provides in pertinent part:

"(1) The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes.

. . . . .

(3) The judgment or order may contain any other provision directed against the appropriate party to the proceeding concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, the

question but that the duty to support a child falls upon both its parents. Section 19–6–102, C.R.S.1973 (1978 Repl. Vol. 8). It is equally clear that this obligation of support extends to all parents, regardless of their marital status. Section 19–6–103, C.R.S.1973 (1978 Repl. Vol. 8). Illegitimate children have the same judicially enforceable right to support as do legitimate children. *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).[5]

## I.

The crux of P. D. G.'s equal protection argument is that the UPA, while gender-neutral on its face, operates to deny him equal protection by implicitly accommodating the decision of C. F. B. to carry the fetus to term while ignoring his own express desire that the pregnancy be terminated.[6]

■ Gender-based distinctions must serve important governmental objectives,

and a discriminatory classification must be substantially related to the achievement of those objectives in order to withstand judicial scrutiny under the equal protection clause. *Mississippi University for Women v. Hogan*, —— U.S. ——, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *R. McG. v. J. W.*, 615 P.2d 666 (Colo.1980). The General Assembly articulated the state's objective in promulgating the UPA in section 19–1–102 of the Children's Code,[7] of which the UPA is a part. The objective includes:

> (1)(a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society; . . . .

We recognized the importance of the state's interest in promoting the welfare of the child in *R. McG. v. J. W., supra*. In this instance, the state's objective of protecting the best interests of the child is furthered

---

furnishing of bond or other security for the payment of the judgment, or any other matter in the best interest of the child. The judgment or order may direct the father to pay the reasonable expenses of the mother's pregnancy and confinement.

(4) Support judgments or orders ordinarily shall be for periodic payments which may vary in amount. In the best interest of the child, a lump-sum payment or the purchase of an annuity may be ordered in lieu of periodic payments of support. The court may limit the father's liability for past support of the child to the proportion of the expenses already incurred that the court deems just.

(5) In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, a court enforcing the obligation of support shall consider all relevant facts, including:

(a) The needs of the child;

(b) The standard of living and circumstances of the parents;

(c) The relative financial means of the parents;

(d) The earning ability of the parents;

(e) The need and capacity of the child for education, including higher education;

(f) The age of the child;

(g) The financial resources and the earning ability of the child;

(h) The responsibility of the parents for the support of others; and

(i) The value of services contributed by the custodial parent.

(6) Any order of support made pursuant to subsection (4) or (5) of this section shall continue until the child is eighteen years of age, or in the discretion of the court until the child is twenty-one years of age, unless the support order is terminated sooner by court order. . . ."

5. The appellant limits his challenge to the duty of child support as it is imposed upon unwilling fathers of illegitimate children. Under the rationale of *Gomez v. Perez, supra*, however, the statutory construction which the appellant urges could not constitutionally be limited to the fathers of illegitimate children.

6. The appellant concedes that it is solely the woman's right to decide to abort the fetus or to carry it to term. Further, the appellant concedes that he is not challenging the constitutionality of section 19–6–116 as a whole but simply its application to fathers in his circumstances. We address in Part II whether fathers in his circumstances are constitutionally entitled to different treatment. The basis of the appellant's equal protection argument can only be the alleged discrimination which underlies section 19–6–116 and which emerges only in the application of that section to him: it allows women a choice in childbearing which it denies to men.

7. Title 19, C.R.S. 1973 (1978 Repl. Vol. 8).

by the statutory provision for child support orders in the course of proceedings to determine the existence of a parent-child relationship. Section 19–6–116, C.R.S.1973 (1978 Repl. Vol. 8). The appellant does not dispute the significance of the state's objective.

 The state has little choice in the means employed to achieve its objective. The statute's tacit accommodation of the mother's decision not to terminate her pregnancy is the only constitutional course open to the state. A woman has a fundamental right to decide in conjunction with her physician whether to terminate her pregnancy. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Further, the United States Supreme Court declared in *Maher v. Roe,* 432 U.S. 464, 472, n. 7, 97 S.Ct. 2376, 2381 n. 7, 53 L.Ed.2d 484 (1977), "A woman has at least an equal right to choose to carry the fetus to term as to choose to abort it." In *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 69, 96 S.Ct. 2831, 2841, 49 L.Ed.2d 788 (1976), the United States Supreme Court ruled that the "state cannot delegate to a spouse a veto power which the state itself is absolutely and totally prohibited from exercising during the first trimester of pregnancy."[8] Here, the equal treatment which appellant seeks could only be achieved by according a father the right to compel the mother of his child to procure an abortion. This result is clearly foreclosed by *Roe, Maher,* and *Danforth.* As the Supreme Court noted in *Danforth,* 428 U.S. at 71, 96 S.Ct. at 2842, "The obvious fact is that when the wife and the husband disagree on this decision, the view of only one of the two partners can prevail. Inasmuch as it is the woman who bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor."

Thus, at no stage does the appellant's right to be free from gender-based classifications outweigh the substantial and legitimate competing interest. The appellant's right is overridden prior to childbirth by the state's interest in protecting C. F. B.'s fundamental right to make decisions relating to her pregnancy, and thereafter by the state's interest in ensuring that children receive adequate support. We find no violation of equal protection in the statutory obligation of both parents to pay child support or in the denial to the appellant of the right to demand the termination of C. F. B.'s pregnancy.

## II.

The appellant claims that section 19–6–116 violates due process by creating an irrebuttable presumption[9] that a father should share in the duty of child support.[10] He submits that so long as there existed an unalterable nexus between conception and childbirth, the presumption was valid, but contends that the current availability of legalized abortion creates the possibility of demonstrating that the nexus has been broken. In support of his position that he should not shoulder any of the responsibility for support of S. P. B., the appellant made an offer of proof in district court that he had promised to pay for an abortion

---

**8.** *A fortiori,* a woman could not be required to obtain consent to an abortion by a man to whom she is not married. The interests which courts have found inadequate to justify the consent of the spouse—*e.g.,* an asserted property interest in the fetus and the interest in the procreative potential of the marriage—are even less persuasive when asserted by an unmarried father. *See Poe v. Gerstein,* 517 F.2d 787 (5th Cir. 1975).

**9.** The scope of the protection afforded by the irrebuttable presumption doctrine has come to be regarded by some courts as coextensive with that of the equal protection clause. *E.g., Trafelet v. Thompson,* 594 F.2d 623, 630 (7th Cir. 1979) and cases cited therein.

**10.** Section 19–6–116(5) leaves open the possibility that either parent may demonstrate a financial inability to contribute to child support. It does not permit, and, we conclude, cannot constitutionally be construed to permit a father to extinguish or to lessen his duty to share in the support of his child by showing that he offered to pay for an abortion.

within the first trimester of C. F. B.'s pregnancy. The appellant argues that the statute must, consistent with due process considerations, provide him an opportunity to rebut the presumption.

■ Statutes creating permanent irrebuttable presumptions have long been disfavored under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). The most common remedy applied is requiring the decision maker to permit rebuttal and thus to allow exceptions to general rules. As a threshold requirement for invocation of this remedy, a case must be appropriate for review under a heightened standard of scrutiny. *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); Tribe, *American Constitutional Law* § 16–32 (1978). The presence of a gender-based classification makes irrebuttable presumption analysis relevant here.

■ A statutory presumption can be invalidated only when a two-pronged test is met: when the presumption is not necessarily or universally true and when the state has reasonable alternative means of making the crucial determination. *Vlandis,* 412 U.S. at 452, 93 S.Ct. at 2236. Because the appellant's challenge to the child support statute fails to satisfy the second element of the *Vlandis* test, we need not examine the first.

The statutory presumption of a shared parental obligation of child support protects three critical interests: the interest of the child in receiving adequate support, the interest of the state in ensuring that children not become its wards, and the interest of the parents in being free from governmental intrusion into the intimate sphere of family life. In view of these critical functions, the state has no "reasonable alternative means of making the crucial determi-

nation" that a nexus exists between conception and child birth. The alternative, which the appellant propounds, is a case-by-case determination of whether the presumed nexus was broken by the father's offer to pay for an abortion, by prior agreement between the parties, by a subsequent "release" of one party's obligation by another, or by any of a multitude of legal theories which ingenious litigants and their lawyers might advance. A judicial inquiry of this nature represents unconscionable governmental interference with privacy rights which the Supreme Court has deemed inviolate. *See, e.g., Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

There are additional untoward consequences which lurk behind the establishment of a rule of law that fathers could avoid the obligation to support their children [11] in the manner suggested by appellant. Once the criteria for proving a firm offer of an abortion had been enunciated, any man could forever escape this duty simply by making the offer in the prescribed manner. Taking this theory to its logical extreme, a woman could similarly avoid her obligation of support by proving that she had made a firm offer to procure an abortion and that the father, by declining it, assumed all responsibility for their child. The statutory presumption that parents who have participated in the conception of a child assume a joint responsibility for that child reflects the well-considered judgment of the legislature as to the only feasible means of achieving legitimate societal goals. The presumption embodied in section 19–6–116 furthers the substantial interests which the state has in protecting the respective rights of children, of parents, and of itself. Therefore, we conclude that the presumption contained in section 19–6–116 does not deny due process to the appellant.

---

**11.** See footnote 5, *supra.*

Further, we note that our decision accords with those of the three other appellate courts which have reached this issue, although each followed a somewhat different path to the same result. The Texas Court of Appeals held that the decision whether to bear children is a fundamental liberty, and that a woman's exercise of that liberty does not break the nexus between conception and child birth so as to deny equal protection or due process to the father. *D. W. L. v. M. J. B. C.,* 601 S.W.2d 475 (Tex.Civ.App.1980). Basing its decision on state law, the Alabama Supreme Court held in *Harris v. State,* 356 So.2d 623 (Ala. Sup.Ct.1978) that an unmarried father could no more escape his legal obligation to his child because its mother had refused to obtain an abortion than could his married counterpart. The Maryland Court of Appeals upheld the constitutionality of Maryland's paternity statute in *Dorsey v. English,* 283 Md. 522, 390 A.2d 1133 (1978). The father argued, as does the appellant in this case, that the mother's independent decision to bring the fetus to full term so attenuated his role in the birth of the child that the statute imposing support obligations on both treated him unequally. The court concluded that the statute treated the parties equally and rejected the father's contentions.

We have examined the appellant's other arguments and find them without merit.

Finally, we hold, based on our review of the record, that the trial court did not abuse its discretion in ordering appellant to pay one-half the birth expenses of S. P. B. and $150 per month in child support.

Judgment affirmed.

LEE, J., does not participate.