659 F.2d 476
 Mark N. SCHEINBERG, M.D., on his behalf and on behalf of all
others similarly situated, Plaintiff-Appellee,
v.
James C. SMITH, Attorney General of Florida and Michael J.
Satz, State Attorney, Seventeenth Judicial
Circuit, Florida, Defendants-Appellants.
 No. 80-5023.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Oct. 2, 1981.
 Gerald B. Curington, Asst. Atty. Gen., Dept. of Legal Affairs, Civ. Div., Tallahassee, Fla., for defendants-appellants.
 Bruce S. Rogow, Fort Lauderdale, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 This is an appeal of a district court determination that certain of Florida's statutory provisions, Fla.Stat.Ann. § 390.001(4)(a) & (b) (West 1981) (previously codified as part of the Medical Practice Act, see Fla.Stat.Ann. § 458.001 et seq. (West 1977)), unconstitutionally burden a woman's fundamental right of privacy in the abortion decision. We affirm the district court in part, vacate in part and remand for further proceedings.
 
 
 2
 * In 1979 the Florida Legislature enacted the Medical Practice Act, which included a provision regulating abortions; relevant here are those subsections governing abortions sought by unmarried minors and by married women. Subsection 4(a), Fla.Stat.Ann. § 390.001(4)(a) (West 1981), establishes that in order to obtain an abortion, an unmarried minor must have "either the written informed consent of a parent, custodian, or legal guardian or an order from the Circuit Court." Scheinberg v. Smith, 482 F.Supp. 529, 532 (S.D.Fla.1979). In full, subsection 4(a) reads
 
 
 3
 (4) Prior to terminating a pregnancy, the physician shall obtain the written informed consent of the pregnant woman or, in the case of a mental incompetent, the written consent of the court-appointed guardian.
 
 
 4
 (a) If the pregnant woman is under 18 years of age and unmarried, in addition to her written request, the physician shall obtain the written informed consent of a parent, custodian, or legal guardian of such unmarried minor, or the physician may rely on an order of the circuit court, on petition of the pregnant unmarried minor or another person on her behalf, authorizing, for good cause shown, such termination of pregnancy without the written consent of her parent, custodian, or legal guardian. The cause may be based on a showing that the minor is sufficiently mature to give an informed consent to the procedure, or based on the fact that a parent unreasonably withheld consent by her parent, custodian, or legal guardian, or based on the minor's fear of physical or emotional abuse if her parent, custodian, or legal guardian were requested to consent, or based upon any other good cause shown. At its discretion the court may enter its order ex parte. The court shall determine the best interest of the minor and enter its order in accordance with such determination.
 
 
 5
 Fla.Stat.Ann. § 390.001(4)(a) (West 1981).
 
 
 6
 Subsection 4(b) requires "a wife who is neither 'separated or estranged' (to) furnish her husband with notice of the proposed abortion and (to) allow him the opportunity to consult with her concerning the procedure," Scheinberg, 482 F.Supp. at 532, and reads
 
 
 7
 (b) If the woman is married, the husband shall be given notice of the proposed termination of pregnancy and an opportunity to consult with the wife concerning the procedure. The physician may rely on a written statement of the wife that such notice and opportunity has been given, or he may rely on the written consent of the husband to the proposed termination of pregnancy. If the husband and wife are separated or estranged, the provisions of this paragraph for notice or consent shall not be required. The physician may rely upon a written statement from the wife that the husband is voluntarily living apart or estranged from her.
 
 
 8
 Fla.Stat.Ann. § 390.001(4)(b) (1981). The Medical Practice Act also provides that "(a)ny person who willfully performs, or participates in, the termination of a pregnancy in violation of the requirements of this section is guilty of a felony ...". Fla.Stat.Ann. § 390.001(10) (West 1981).
 
 
 9
 Soon after the Act was passed, Dr. Mark Scheinberg, under the pseudonym of John Jones, M.D., filed this class action complaint against the state officers charged with enforcement of the Act, seeking declaratory and injunctive relief on the grounds that the Act abridged the constitutional right to privacy in the abortion decision. The parties stipulated that Dr. Scheinberg, as a licensed physician who performs abortions in Florida, had standing to maintain this action on behalf of "all unmarried, minor pregnant women desiring to terminate their pregnancies, and their physicians; and ... all married pregnant women desiring to terminate their pregnancies, and their physicians." Scheinberg, 482 F.Supp. at 532 n.7. See also Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).
 
 
 10
 On July 10, 1979, the district court held an initial hearing to consider the plaintiff's application for preliminary relief. After that hearing the court, on the strength of Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (Bellotti II), preliminarily enjoined the defendants from enforcing section 458.505(4)(a) of the Act, now section 390.001(4)(a), regulating a minor's access to an abortion. The court found, however, that the plaintiff had not demonstrated a substantial likelihood of prevailing on the merits of his claim concerning the spousal notice provision, section 458.505(4)(b), now section 390.001(4)(b), and accordingly refused to enjoin the enforcement of that provision. Jones v. Smith, 474 F.Supp. 1160 (S.D.Fla.1979).
 
 
 11
 In September of 1979, the district court held a final hearing on the plaintiff's request for declaratory and permanent injunctive relief from the operation of subsection (4)(a) and (b). The court reaffirmed its earlier finding that subsection 4(a) impermissibly abridged a minor, unmarried woman's right of privacy in the abortion decision, and also held, after reconsideration, that the spousal notice provision, subsection 4(b), was an unconstitutional burden on the abortion decision. Consequently, the court declared each subsection unconstitutional. Scheinberg, 482 F.Supp. at 540. This appeal followed.
 
 
 12
 The appellants raise several issues concerning the propriety of the district court's ruling. As to the court's invalidation of the provision regulating a minor's access to abortion, the appellants "candidly admit that such provision cannot withstand constitutional challenge in light of Bellotti v. Baird " (Bellotti II) if the district court's interpretation of that subsection is upheld. Brief of Appellants at 17. They submit, however, that the district court erred in reaching the matter of statutory construction; they argue that the district court, in the interest of federal-state comity, should have abstained from resolving the question. Alternatively, the appellants assert that this court should avail itself of the certification procedure provided for in Fla.Stat.Ann. § 25.031 (West 1979) to allow the Florida courts to interpret subsection 4(a). See also Fla.Const., art. V § 3(b)(6). If we determine that neither of these courses are appropriate, the appellants contend that Florida law allows severance of the offensive portions of subsection 4(a) in order to save the rest of the subsection from invalidation.
 
 
 13
 In regard to the spousal notice provision, the appellants' arguments are more direct. That provision, they assert, does not impose an undue burden on a woman's right of privacy in the abortion decision. Any burden it does impose, they allege, is justified by the compelling state interests furthered by the statute.
 
 II
 
 14
 * We shall not belabor the constitutional question section 390.001(4)(a) presents, as the Supreme Court has resolved that issue. In Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the Court held that a state may require, alternatively, parental consent or judicial authorization before allowing an unmarried minor to secure an abortion. The Court specified, however, that judicial authorization must be given if the minor "satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own," id. at 647, 99 S.Ct. at 3050, or if, absent this showing, the court determines that the abortion would nevertheless be in the minor's best interest. Id. at 647-48, 99 S.Ct. at 3050.
 
 
 15
 As we read subsection 4(a), its last sentence, "(t)he court shall determine the best interest of the minor and enter its order in accordance with such determination" (emphasis added), mandates that a Florida court base its authorization of a minor's abortion on what it finds to be the best interests of the minor, without regard to the minor's maturity. Thus, the provision runs directly afoul of Bellotti II, for "it permits judicial authorization for an abortion to be withheld from a minor who is found by the ... court to be mature and fully competent to make this decision independently." Bellotti II at 651, 99 S.Ct. at 3052. If we reach the merits of plaintiff's claim, therefore, it is clear that subsection 4(a) must fall. Faced with this prospect, the appellants argue that a proper exercise of discretion, see Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), requires the federal courts to abstain from resolving the merits of this claim.
 
 
 16
 Pullman abstention is appropriate when a statutory provision, as yet unconstrued by the relevant state court of last resort, is sufficiently ambiguous or uncertain to allow a state court interpretation that would moot the federal constitutional question raised. Palmer v. Jackson, 617 F.2d 424, 428 (5th Cir. 1980). Absent ambiguity, abstention lacks utility and thus is improper. New Motor Vehicle Board v. Orrin W. Fox Co., 439 U.S. 96, 100 n.3, 99 S.Ct. 403, 407 n.3, 58 L.Ed.2d 361 (1978); Lake Carriers Association v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971). The issue, therefore, is whether subsection 4(a) is sufficiently ambiguous to justify invoking the narrow exception to the exercise of federal jurisdiction that the abstention doctrine creates. See Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).
 
 
 17
 On its face, subsection 4(a) plainly requires that the state court determine the best interests of the minor seeking an abortion. "Shall" is not a precatory word. Further, the subsection does not provide an exception to this inquiry when the court determines that the minor in question is adequately mature to make the abortion decision herself. We find no ambiguity here. See Barry v. Barchi, 443 U.S. 55, 63 n.10, 99 S.Ct. 2642, 2648 n.10, 55 L.Ed.2d 514 (1979). Furthermore, even if the offending "shall" could be construed as permissive rather than mandatory, as appellants assert, Brief of Appellants at 10-12, this ambiguity would be insufficient to trigger abstention. The language of Bellotti II is not permissive: "(i)f (the minor) satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act ..." Bellotti II, 443 U.S. at 647, 99 S.Ct. at 3050. Thus, whether permissive or mandatory, subsection 4(a) vests Florida courts with constitutionally impermissible discretion to ignore a minor's maturity in determining whether to authorize her abortion. We do not perceive any construction of the statute reasonably available to the Florida courts that could moot this constitutional question, Palmer, 617 F.2d at 428, and thus we find abstention inappropriate.
 
 
 18
 For similar reasons, we reject the appellants' assertion that this case presents a proper opportunity for use of the certification procedure. Uncertainty is a prerequisite to certifying a question of law to a state's highest court, just as it is a prerequisite to invocation of the Pullman doctrine. Lehman Brothers v. Schein, 416 U.S. 386, 390-91, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974). See also Bellotti v. Baird, 428 U.S. 132, 96 S.Ct. 2857, 61 L.Ed.2d 797 (1976) (Bellotti I); Boston Old Colony Ins. Co. v. Balbin, 591 F.2d 1040, 1045 (5th Cir. 1979). Accordingly, we decline to certify the question of subsection 4(a)'s interpretation to the Florida Supreme Court.
 
 
 19
 Finally, as to the matter of severance, we find the appellants' argument singularly unpersuasive. As the district court so aptly observed, we are under a "judicial obligation to sustain the constitutionality of an act whenever possible by severing invalid clauses and permitting the remainder of the act to stand, ..." Jones, 474 F.Supp. at 1169. See also State v. Williams, 343 So.2d 35, 38 (Fla.1977). We cannot, however, sever and repair state statutes at will, for to do so would be to ignore the primary role of the Florida legislature. The controlling inquiry in matters of severance is whether the legislature intended the offensive statutory provision to be an integral part of the statutory enactment viewed in its entirety. See State v. Lee, 356 So.2d 276, 283 (Fla.1978). As the district court stated, "the question is whether the legislature would have enacted the valid portions of the statute with the unconstitutional portion stricken therefrom." Jones, 474 F.Supp. at 1170.
 
 
 20
 In response to this question the appellants assert that "the Legislature would have enacted (section 390.001(4)(a)) without the unconstitutional last sentence had it had the benefit of the Supreme Court's Opinion in Bellotti v. Baird II." Brief of Appellants at 19. This misses the point, for the question is not whether the Florida Legislature would now adhere to the constitutional mandate of the Supreme Court in Bellotti II, but whether, at the time the statute was enacted, the legislature would have passed it absent the constitutionally objectionable provision. From a careful reading of the statute, we conclude that the legislature would not have so passed section 390.001(4)(a). The last sentence of subsection 4(a) is mandatory. As such, it is not only an integral part of section 390.001(4)(a), but, in fact, it serves as the legislative directive that clarifies and implements the overriding purpose of the entire subsection. The Florida Legislature clearly wished to regulate an unmarried minor's access to abortion, and the vehicle for that regulation, absent parental consent, was to be the considered judgment of a Florida court. To assert that this would not have been the case if the legislature had acted post-Bellotti II does not negate the centrality of the proposition to the legislative intent pre-Bellotti II. Thus, we must refuse the invitation to enter the state legislative arena; we cannot judicially sever a portion of an enactment on the authority of a wholly speculative, and insupportable, interpretation of legislative intent.[1]
 
 B
 
 21
 The constitutional issue section 390.001(4)(b) presents is whether a state may require a married woman presently living with her spouse to notify her husband of her intent to terminate her pregnancy and to provide him with an opportunity to consult with her concerning the abortion procedure.
 
 
 22
 Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), establishes that the right of privacy, "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action," id. at 153, 93 S.Ct. at 727, includes a woman's decision to terminate her pregnancy. Id. at 154, 93 S.Ct. at 727. While entitled to constitutional protection, "this right is not unqualified and must be considered against important state interests in regulation." Id. When any state regulations implicate directly a woman's abortion decision, it is incumbent on a court to determine whether the regulations in question are justified by a compelling state interest and whether they have been drafted narrowly to further that compelling state interest: "(w)here certain 'fundamental rights' are involved, the (Supreme) Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." Id. at 155, 93 S.Ct. at 728 (citations omitted). See also Carey v. Population Services International, 431 U.S. 678, 686, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); Poe v. Gerstein, 517 F.2d 787, 791 (5th Cir. 1975), aff'd sub nom. mem., Gerstein v. Coe, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). Cf. Maher v. Roe, 432 U.S. 464, 475-476, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977) (state regulation that does not interfere directly with a woman's abortion decision does not call for the compelling state interest standard of review).
 
 
 23
 In litigating an abortion case such as the one before us, therefore, the plaintiff has the initial burden of demonstrating that the state regulation in question interferes directly with a woman's abortion decision. "(T)o trigger strict scrutiny of (the abortion regulation) it is the plaintiffs' burden to demonstrate only that it is a 'direct interference' with the abortion decision or imposes restrictions that did not already exist." Charles v. Carey, 627 F.2d 772, 777 (7th Cir. 1980). Once the plaintiff makes this demonstration, "the State has to show the compelling basis for the law, that is, that the burden (imposed on the abortion decision) is not 'undue' or unjustifiable." Id. It is within this framework that we approach this appeal.
 
 
 24
 The district court determined, on the basis of testimony adduced at the final hearing, that Florida's spousal notification provision imposed a burden on a woman's decision to terminate her pregnancy. Scheinberg, 482 F.Supp. at 538. Once the plaintiff had shown that a burden had been imposed, and that it was "not de minimis," Charles, 627 F.2d at 777, the district court focused its attention on the character and substance of the state interests allegedly supporting the regulation. We shall now follow the same course, for it is clear that Florida has, in the spousal notification requirement, created an obstacle, hitherto nonexistent, "in the path of a woman's exercise of her freedom of choice." Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980). The spousal notice provision plainly leaves a married woman with something less than the completely "untrammeled freedom of choice" the Supreme Court recently reaffirmed as the mandate of Roe, Harris at 313, 100 S.Ct. at 2686, and thus the state must be called upon to justify its action. Population Services, 431 U.S. at 686, 97 S.Ct. at 2016. See also Harris, 448 U.S. at 312, 100 S.Ct. at 2685.
 
 
 25
 The state seeks to justify subsection 4(b) by arguing that the notice provision furthers two state interests: maintaining and promoting the marital relationship; and protecting a husband's interest in the procreative potential of the marriage. See Scheinberg, 482 F.Supp. at 538-39; Brief of Appellants at 47-68.[2] We hold that these interests, weighed together and, for purposes of analysis, telescoped into a state interest in furthering the integrity of the state-created and regulated institutions of marriage and the family, are "sufficiently weighty," Poe, 517 F.2d at 796, to justify the burden on a woman's abortion decision imposed by the spousal notification requirement.
 
 
 26
 The institution of marriage is central to our society, Zablocki v. Redhail, 434 U.S. 374, 383-84, 98 S.Ct. 673, 679-80, 54 L.Ed.2d 618 (1978); Griswold v. Connecticut, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), as is the family. Prince v. Massachusetts, 321 U.S. 158, 165, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944). It is precisely because of the cultural centrality of these institutions that they receive heightened protection under the Constitution. Moore v. East Cleveland, 431 U.S. 494, 502-503, 97 S.Ct. 1932, 1937-38, 52 L.Ed.2d 531 (1977) (plurality opinion of Justice Powell). "Of course, the family is not beyond regulation." Id. at 499, 97 S.Ct. at 1936. Neither is marriage. See Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Poe, 517 F.2d at 795. Logic demands that we acknowledge the propriety of such regulation when it furthers or maintains the integrity of these institutions. Poe, 517 F.2d 787.
 
 
 27
 Both the creation and protection of the marital entity, as well as of the legally recognized family, are primarily a matter of state concern. "(S) tatutory regulation of domestic relations (is) an area that has long been regarded as a virtually exclusive province of the States." Sosna, 419 U.S. at 404, 95 S.Ct. at 559. See also Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 29 L.Ed.2d 156 (1971); Estin v. Estin, 334 U.S. 541, 68 S.Ct. 1213 (1948).
 
 
 28
 Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the (state or territorial) legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.
 
 
 29
 Maynard v. Hill, 125 U.S. 190, 205, 8 S.Ct. 723, 726, 31 L.Ed. 654 (1888) (emphasis added). The State of Florida, therefore, is on solid ground in asserting both that the state has the primary interest in regulating the integrity of marital, and hence familial, life, and that this interest is extremely substantial.
 
 
 30
 It is apparent, moreover, that notice and consultation does, in general,[3] further the integrity of marital and familial life:
 
 
 31
 (T)he testimony revealed that experts from the disciplines of psychiatry, gynecology, psychology and obstetrics, as well as counselors and social workers, uniformly encourage married couples to consult on particularly important decisions such as whether to terminate a pregnancy. By definition, a good or sound relationship is one in which mutual communication on sensitive and difficult topics like sex, childbirth and abortion is commonplace.
 
 
 32
 Scheinberg, 482 F.Supp. at 537. We hasten to note that this finding is based on testimony elicited from the plaintiff's experts. See, e. g., Record, vol. III at 29, 120; id. vol. IV at 177-78. Our next inquiry is whether the state interest is compelling, thus justifying the burden the Florida Legislature has placed on the abortion decision.
 
 
 33
 It is here that we hesitate for, by definition, this inquiry is really a comparative weighing of two compelling matters: a married woman's right to privacy in the abortion decision and the state's interest in ensuring that the institution of marriage maintains its authenticity.[4] We know of no way to approach this weighing of juxtaposed interests other than to consider "the basic values that underlie our society." Moore, 431 U.S. at 503, 97 S.Ct. at 1937, and, through that perspective, to evaluate the impact of this clash of rights on the core substance of each. See Poe v. Ullman, 367 U.S. 497, 539-555, 81 S.Ct. 1752, 1774-1783, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). This is surely a troubling journey into the realm of substantive due process, see Roe, 410 U.S. at 167-168, 93 S.Ct. at 734 (Stewart, J., concurring); see also Parratt v. Taylor, --- U.S. ----, ----, 101 S.Ct. 1908, 1920-23, 68 L.Ed.2d 420, 4515-16 (1981) (Powell, J., concurring), yet we can discern no alternative given the present state of our jurisprudence. See Poe v. Gerstein. But see Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). See also Parratt v. Taylor, --- U.S. ----, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).
 
 
 34
 In Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court struck down a Missouri statute requiring a married woman to obtain the consent of her spouse before securing an abortion. In so holding, the Court noted that the statute in question
 
 
 35
 does much more than insure that the husband participate in the decision whether his wife should have an abortion.... The State, (rather,) has granted him the right to prevent unilaterally, and for whatever reason, the effectuation of his wife's and her physician's decision to terminate her pregnancy. This state determination not only may discourage the consultation that might normally be expected to precede a major decision affecting the marital couple but also, and more importantly, the State has interposed an absolute obstacle to a woman's decision that Roe held to be constitutionally protected from such interference.
 
 
 36
 Danforth at 70-71 n.11, 96 S.Ct. at 2841-42 n.11. See also Poe v. Gerstein.
 
 
 37
 The Florida statute before us does not run afoul of the concerns emphasized in Danforth. The statute requires notice, not consent, and it admittedly furthers, rather than discourages, marital consultation. The intrusion into a woman's ability to exercise freedom of choice is thus much less here than in Danforth. The trade-off for this intrusion is furtherance of marital integrity, as implicated by the abortion decision. The Supreme Court has acknowledged that the abortion decision affects a marriage: "we recognize that the decision whether to undergo or to forego an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious." Danforth at 70, 96 S.Ct. at 2841.
 
 
 38
 We need but discuss briefly why a state should concern itself with such marital ramifications. By creating marriage as the vehicle for legally safeguarded family life, the state has made the marital partners entirely dependent on each other for fulfillment of familial aspirations. If either partner is to enjoy one of the primary purposes of marriage, the bringing forth and nurturing of children, see Poe, 517 F.2d at 796, each partner must cooperate in matters of childbirth. Most assuredly the state does not have the right to require, as an incident of marriage, the fulfillment of each spouse's procreative desires. Id. at 797. The state does, however, have a substantial interest in attempting to ensure that the state-created vehicle for procreation, marriage, not be abused through one spouse perpetually and secretively frustrating the other's desire for offspring. All Florida has decided is that, if a woman wishes to forego childbirth, she must notify her partner in family life. Her husband has legally committed himself to a contractual relationship that prohibits the extra-marital creation of children. If his aspirations include a desire for children, it is a small concession for him to have the right to know that his wife is considering an abortion. The marital relationship is the only legitimate vehicle the husband presently has for realizing his procreative rights. The husband's ability to procreate, moreover, is entitled to constitutional protection. Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The state, therefore, has a compelling interest in requiring a wife to inform her husband when she is contemplating termination of a pregnancy. Absent such a right the marital relationship between a couple could be maintained without a husband ever discovering why or how his aspirations for a family have been frustrated. This is surely a perversion of the institution of marriage, as conceived in our society and as instituted by the state.
 
 
 39
 In essence, therefore, the spousal notice provision is a statutory burden on a woman's abortion decision that, in the final analysis, takes less from a woman's untrammelled right to secure an abortion than it adds to the protection of the integrity and dignity of family life.[5] It is abhorent to us that the Florida Legislature conceived a need for such a safeguard; it says much about the legislature's perception of the current state of ethics in maritaldecisionmaking. Yet, it is not for us to second-guess reasonable legislative perceptions. Given the defensible character of those perceptions, it is for us only to evaluate the quality of the state interest furthered by legislation arising from them. We have found that interest compelling. Our final inquiry, therefore, is into whether the statute, as enacted, is drafted narrowly enough in furtherance of that interest to pass constitutional muster.
 
 
 40
 The district court recited two reasons for holding that section 390.001(4)(b) was not drafted in a constitutionally acceptable manner. Scheinberg, 482 F.Supp. at 540. First, the court found subsection 4(b) underinclusive "because it does not require that a married woman notify and consult with her husband about an impending hysterectomy or tubal ligation." Id. at 540. While this is so, and while it is also true that requiring spousal notification of such procedures arguably would further the integrity of marriage, we do not feel that the argument is persuasive. Section 390.001 deals with the termination of pregnancy. Presumably, the Florida Legislature was focusing its attention on that matter when it drafted this statute. This court may not demand that a legislature address each manner of furthering a specific state interest when it legislates on one, discrete matter. See analogously Dandridge v. Williams, 397 U.S. 471, 486-487, 90 S.Ct. 1153, 1162, 26 L.Ed.2d 80 (1970). Moreover, the Supreme Court has stressed that a state may single out abortion for special legislative regulation because of its unique character and profound ramifications. Danforth, 428 U.S. at 67, 96 S.Ct. at 2840. See also Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051; Bellotti I, 428 U.S. at 149-150, 96 S.Ct. at 2857.[6] Second, the court below held the statute overinclusive because it "makes no exception for a married woman carrying the child of someone other than her husband." Scheinberg, 482 F.Supp. at 540. The district court's findings are inadequate to sustain invalidation of the statute on this ground. We must remand, therefore, for findings necessary for determining whether the Florida Legislature acted within the proper constitutional sphere despite its failure to limit the notice and consultation provision to abortions of jointly conceived children.
 
 
 41
 The state interest sought to be furthered by this legislation encompasses more than merely the husband's interest in a particular fetus. Cf. Poe v. Gerstein, (discussing the drafting of a spousal consent statute requiring a husband to consent to an abortion of a fetus whether or not he is the father). It encompasses furthering the institutional integrity of the marital relationship, and of the family. We have held that interest to be, in constitutional terms, compelling, and thus ample justification for establishing spousal notice and consultation requirements.
 
 
 42
 In light of this state interest, it is apparent that the issue of paternity is peripheral to our analysis. The question is not whether notice should be required if a husband is not the father of the fetus, but rather whether the abortion procedure poses a substantial enough risk of a decrease in fertility to affect detrimentally, e. g., in more than a de minimis fashion, the procreative potential of a marriage. If it does, it follows that, given non-estrangement of the couple, as section 390.001(4)(b) posits, it is irrelevant whether the husband is father of the fetus. Having children is a major purpose of the institution of marriage. The state's interest in maintaining the integrity of this component of marriage is compellinging. If proper abortion procedures have the potential to affect adversely a woman's future procreative ability, the state may require notice to the husband of the abortion, and hence of the possible impact on the marriage's child-bearing capacity, whether or not he is the father of the fetus. This result follows from extension of the proper deference to what would thus be the legislature's reasonable decision to further the state's compelling interest in the marital and familial relationships by enacting section 390.001(4)(b).
 
 
 43
 The record reflects, and the district court acknowledges, Scheinberg, 482 F.Supp. at 539, that the parties presented conflicting evidence concerning the degree of risk to the procreative potential of a marriage posed by abortion. The court did not, however, make a specific finding as to that risk based upon the presented evidence. This is definitely an issue of fact within the purview of the district court. We cannot act absent this essential finding. Therefore, we remand for a specific finding of whether the legislature could have concluded reasonably, from the evidence in the record, and from any further evidence the parties may present in light of our holding today, that the abortion procedure, as performed properly by licensed medical practitioners according to methodology approved by prevailing medical authority and generally in use in Florida, poses a greater than de minimis risk to a married woman's future ability to bear children.
 
 
 44
 For the aforementioned reasons, we affirm the district court's determination that section 390.001(4)(a) is unconstitutional; we vacate its determination that section 390.001(4)(b) is unconstitutional and remand for findings prerequisite to a determination of the validity of section 390.001(4)(b).
 
 
 45
 AFFIRMED in part; VACATED in part; and REMANDED, with instructions, for further proceedings.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 Appellants also contend that, if we decline to sever the last sentence of subsection 4(a), we should stay our hand and certify to the Florida Supreme Court the question of whether a Florida court would intervene to sever it. As we discussed previously, certification is proper only when there is "great unsettlement" in the law. Lehman Bros., 416 U.S. at 391, 94 S.Ct. at 1744. But the court and all parties to this litigation agree on the legal standards to be applied, cf. Bellotti I, 443 U.S. at 148 n.16, 96 S.Ct. at 2866 n.16 (1976) ("heated debate" among the litigants concerning the meaning of a statute is a "strong indication" of uncertainty), and thus the prerequisite for refraining from immediate exercise of our jurisdiction is absent
 
 
 [2]
 We must emphasize that the parties to this litigation made no issue about the identity of these state interests. The record, however, does not indicate the precise source for the assertion that these interests were those the Florida legislature wished to further through enactment of subsection 4(b). All contentions concerning these state interests seem to have found their way into the record of this case through a process of argumentation rather than of proof. See, e. g., Record, vol. II at 37-38. Because the parties have, by trying the case in this manner, effectively stipulated that these are the state interests to be weighed in our analysis, we accept them as such. We are compelled, however, to emphasize that it is not proper for us either to speculate, see, e. g., Scheinberg, 482 F.Supp. at 539 n.50, as to what the Florida legislature intended to further by enacting this statute, or to accept the speculative conclusions of the district court on the same matter. The state interests intended to be furthered by legislation are appropriately a matter subject to proof in the district court, where it is incumbent on the state to offer into evidence the justification for its legislative act. Michael M. v. Superior Court of Sonoma County, --- U.S. ----, 101 S.Ct. 1200, 1203 (1981). Inferential identification of state interests allegedly advanced by legislation, see id. at ---- n.6, 101 S.Ct. at 1205, is entirely unsatisfactory and we admonish litigants to assist us by advancing evidence of state interests in the trial court
 
 
 [3]
 We do not consider here whether the statute, in addition to furthering the asserted state interest, is drawn narrowly enough to avoid constitutionally offensive overbreadth. See infra, at 486-487, for our resolution of that issue
 
 
 [4]
 By authenticity we mean a marital relationship characterized by institutional integrity, not marital harmony, as the district court apparently assumed. Scheinberg, 482 F.Supp. at 540. The concept we wish to convey is that the state has an interest in attempting to ensure that the institution of marriage maintains its identity with its conceptual essence. For example, the appellants have asserted that the notice provision furthers truthful and forthright communication between the spouses and mutuality of decisionmaking, which reflects Florida's notion of marriage as an ongoing, dual passage through life. The state interest underlying the regulation, therefore, is in attempting to bring the real into as close proximity as possible with the state's ideal conception
 
 
 [5]
 We wish to emphasize here that we do not denigrate the potential impact, in general, of the notice requirement on a woman's freedom of choice. The notice and consultation provision surely may engender some anxiety on the part of the wife, and thus undoubtedly does impinge on the abortion decision. See supra, at 482-483. We refuse, however, to exaggerate the impact of this impingement on an emancipated woman's ability to decide whether to terminate a pregnancy. Paternalistic regard for the decisionmaking abilities of emancipated women, "mature enough to have become pregnant," Danforth, at 428 U.S. 75, 96 S.Ct. at 2844, does little to enhance societal respect for the properly equal role of women in our culture. See analogously H.L. v. Matheson, --- U.S. ----, ----, 101 S.Ct. 1164, 1179 n.2 (1981) (Stevens, J., concurring)
 
 
 [6]
 The district court also held that the statute was drafted inadequately because compliance with its notice and consultation requirements "might result," Scheinberg, 482 F.Supp. at 539 (emphasis added), in an unacceptable delay for a woman wishing to secure an abortion. We must reject this holding, for any such delay is not properly referrable to the statute, but to the actions of individuals who may choose to be less than prompt in complying with the straightforward statutory requirements. Such a volitional delay must be distinguished from constitutionally impermissible, statutorily mandated delay. See Womens Services, P.C. v. Thone, 636 F.2d 206 (8th Cir. 1980) (invalidating 48-hour mandatory waiting period between expression of informed consent and abortion procedure)