Victor **UNDERWOOD** and Carmen Edwards, for themselves and all others similarly situated, **Plaintiffs-Appellants,**

v.

**Nell HUNTER, et al.,
Defendants-Appellees.**

**No. 82–7011.**

United States Court of Appeals,
Eleventh Circuit.

April 10, 1984.

Edward Still, Birmingham, Ala., Neil Bradley, Atlanta, Ga., for plaintiffs-appellants.

James S. Ward, Sp. Asst. Atty. Gen., Montgomery, Ala., for defendants-appellees.

Before TJOFLAT, VANCE and CLARK, Circuit Judges.

VANCE, Circuit Judge:

In 1977 and 1978 the boards of registrars for Montgomery and Jefferson Counties in Alabama barred Carmen Edwards and Victor Underwood, respectively, from representation on the election rolls. They were denied voting privileges under section 182 of the Alabama Constitution, adopted in 1901, which disfranchises those convicted of crimes punishable by imprisonment in the penitentiary, crimes of moral turpitude and other enumerated misdemeanors and felonies.[1] Edwards and Underwood were disfranchised for presenting worthless

---

1. Section 182 of the Alabama Constitution of 1901 provides:

The following persons shall be disqualified both from registering, and from voting, namely:

All idiots and insane persons; those who shall by reason of conviction of crime be disqualified from voting at the time of the ratification of this Constitution; those who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any infamous crime or crime involving moral turpitude; also, any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote of another, or of buying or offering to buy the vote of another, or of making or offering to make a false return in any election by the people or in any primary election to procure the nomination or election of any person to any office, or of suborning any witness or registrar to secure the registration of any person as an elector.

checks, a misdemeanor which the registrars classify as a crime of moral turpitude.[2]

Edwards and Underwood filed suit against the boards of registrars of Montgomery and Jefferson Counties under 42 U.S.C. §§ 1981 and 1983 challenging section 182 as it applies to those convicted of crimes not punishable by imprisonment in the penitentiary (nonprison offenses). They alleged five causes of action, one of which is dispositive. Plaintiffs alleged that the nonprison offenses warranting disfranchisement under section 182 were specifically adopted with the intent to disfranchise blacks on account of their race and that the provision has had exactly its intended effect.[3] They requested a declaration invalidating section 182 and sought to enjoin its future application. With respect to the two claims proceeding to trial, the district court certified a plaintiff class of those disfranchised for nonprison offenses, represented by Underwood and Edwards,[4] and a defendant class of all Alabama county boards of registrars. Following trial in 1981, the district court issued a memorandum opinion ruling for defendants on these two causes of action. Plaintiffs filed this appeal challenging the disposition of all five claims. We hold that section 182 violates the fourteenth amendment because it denies plaintiffs the right to vote on the basis of race.[5]

2. In determining whether an offense is a crime of moral turpitude, the registrars follow Alabama case law and, in the absence of judicial decision, opinions of the state attorney general. The registrars' actions in this case were based on opinions of the attorney general. In *Pippin v. State*, 197 Ala. 613, 73 So. 340 (1916), the Alabama Supreme Court defined a crime of moral turpitude as an act that is "'immoral itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude.'" *Id.* at 616, 73 So. at 342 (quoting *Fort v. City of Brinkley*, 87 Ark. 400, 112 S.W. 1084 (1908)). The attorney general in opinion has acknowledged that the classification of presently unaddressed offenses "will turn upon the moral standards of the judges who decide the question." Pl.Exh. 3; *see also infra* note 13. "Thus does the serpent of uncertainty crawl into the Eden of trial administration." McCormick, *McCormick on Evidence* § 43, at 85–86 (2d ed. 1972).

3. Plaintiffs also alleged: (1) that the section denies the franchise to plaintiffs without a compelling state interest in contravention of the first, fifth and fourteenth amendments; (2) that the section denies plaintiffs equal protection of the laws because more serious crimes are not disabling; (3) that the term "crime involving moral turpitude" is unconstitutionally vague; and (4) that the suffrage provisions of the 1901 Alabama Constitution are stricter than those of the 1868 Constitution, in violation of the Act of Readmission, Act of June 25, 1868, ch. 70, 15 Stat. 73.

Before plaintiffs amended their complaint to add the Readmission Act claim, the district court granted summary judgment for the registrars on the first three causes and dismissed the race discrimination claim for failure to state a claim upon which relief could be granted. We reversed and remanded for further proceedings.

*Underwood v. Hunter*, 604 F.2d 367 (5th Cir. 1979). During subsequent discovery plaintiffs moved for a preliminary injunction premised on the first three theories so that they could vote in the 1980 primaries and general election. We affirmed the order of the district court denying relief because we concluded that plaintiffs had not shown any prospect of irreparable harm. *Underwood v. Hunter*, 622 F.2d 1042 (5th Cir.1980). After the first three claims were again dismissed by the trial court, the Readmission Act claim proceeded to trial with the race discrimination claim.

4. Edwards is black and Underwood is white. From the record of the proceedings below it appears that for purposes of the race discrimination claim the trial court treated Edwards as the representative of a subclass of blacks disfranchised by virtue of conviction of nonprison offenses.

5. The registrars argue that mootness and failure to exhaust administrative remedies bar us from reaching the merits. Exhaustion of administrative remedies, however, is not a prerequisite to the bringing of this action under 42 U.S.C. § 1983. *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The charge of mootness lacks support. In 1980 the office of the state attorney general issued an opinion letter declaring that convictions under municipal ordinances would not warrant disfranchisement. Def.Exh. 2. The registrars argue on the basis of this directive that Edwards might now qualify for registration because worthless check writing is a violation of both city ordinance and state statute. They have adduced no proof that Edwards was convicted of a municipal offense alone and in the meantime they have not offered to reverse their original decision barring registration. We therefore discern nothing that in any way extinguishes Edwards' claim.

■ A successful fourteenth amendment claim of race discrimination in matters affecting voting requires that plaintiffs establish an intent to abridge the franchise on account of race. *City of Mobile v. Bolden*, 446 U.S. 55, 66–67, 100 S.Ct. 1490, 1499–1500, 64 L.Ed.2d 47 (1980) (plurality opinion); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). To establish a violation of the fourteenth amendment in the face of mixed motives, plaintiffs must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor in the adoption of section 182. They shall then prevail unless the registrars prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 & n. 21, 97 S.Ct. 555, 566 & n. 21, 50 L.Ed.2d 450 (1977); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In a case alleging discrimination on the basis of race, the permissible motivating interest articulated by the state must be compelling, *Crawford v. Board of Education*, 458 U.S. 527, 536, 102 S.Ct. 3211, 3217, 73

L.Ed.2d 948 (1982), and the means employed must be precisely drawn to accomplish exactly the objective that the state purports to further. *Kramer v. Union Free School District*, 395 U.S. 621, 632, 89 S.Ct. 1886, 1892, 23 L.Ed.2d 583 (1969).

The district court found that plaintiffs failed to show evidence of discriminatory purpose in the adoption of section 182. It next concluded that even if a racial animus was demonstrated, the state's purported interest in denying criminals the franchise is a permissible one.

■ We cannot agree with the district court. Our review of the record reveals that the district court erred both in its factual findings and in its legal analysis.[6] We conclude that the district court's finding of lack of discriminatory intent in the adoption of section 182 is clearly erroneous. In addition, the district court failed to require the state to show that section 182 would have been enacted in the same form in the absence of racial animus, as *Arlington Heights* requires. By allowing the state to prevail on what the district court concluded was a showing of permissible intent, the court brought its inquiry to a premature end.[7]

---

**6.** On review the district court's findings of fact are entitled to be respected unless they are clearly erroneous. *Hardin v. Stynchcomb*, 691 F.2d 1364, 1372 (11th Cir.1982). Under the clearly erroneous standard, the lower court's findings of fact shall stand unless the reviewing court is left with the definite and firm impression that a mistake has been made. *American National Bank v. Federal Deposit Insurance Corp.*, 710 F.2d 1528, 1533–34 (11th Cir.1983). This standard of review applies to findings of both subsidiary and ultimate fact. *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1110 (11th Cir.1983). Questions of law are subject to independent review, and findings made under an erroneous view of the law may be set aside on that basis. *Pullman-Standard*, 456 U.S. at 287, 102 S.Ct. at 1789.

**7.** The court held that plaintiffs would not have prevailed even if they had shown discrimination because the court discerned a permissible reason for restricting the franchise of criminals. Citing *Palmer v. Thompson*, 403 U.S. 217, 91

S.Ct. 1940, 29 L.Ed.2d 438 (1971), and the plurality opinion in *Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981), the district court ruled that "an impermissible motive standing alone will not invalidate legislation for which there is a permissible basis."

The lower court's reliance on *Michael M.* is misplaced. In *Michael M.*, Justice Rehnquist, writing for a plurality of the Court, quoted *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), to the effect that the existence of an illicit legislative motive does not *automatically* result in a conclusion of unconstitutionality. 450 U.S. at 472 n. 7, 101 S.Ct. at 1205–06 n. 7. The plurality proceeded to cite the burden-shifting test announced in note 21 of *Arlington Heights*, signifying that discriminatory intent *will* defeat a statute where the state is unable to demonstrate that the same result would have occurred solely in light of a permissible motive.

We do not read *Palmer* to the contrary. In *Arlington Heights* the Court cited *Palmer* as support for the proposition that a plaintiff need not necessarily prove that racial discrimination was the sole motivating factor in order to prevail:

Applying the *Arlington Heights* test to the case at hand, the first step is to inquire whether intent to deny the franchise on the basis of race was a substantial or motivating factor in the enactment of section 182. In conducting this inquiry we are mindful of the testimony by expert witnesses for both sides that the purpose of section 182 must be considered in light of the overall purpose of the 1901 constitutional convention and the suffrage article, taken as a whole.

Blacks first received the right to vote in Alabama under the Constitution of 1867, which created universal suffrage for males over the age of twenty-one with certain exceptions not relevant here. Ala. Const. of 1867, art. VII. With the end of Reconstruction, the white citizens of Alabama moved to reassert their once unquestioned political supremacy. The 1890's ushered in an era of disfranchisement not only in Alabama but throughout the South. In 1890 Mississippi adopted a new state constitution embodying the suffrage restrictions proposed in the "Second Mississippi Plan." By 1908 eleven other states, including Alabama, had followed suit through various statutory and constitutional devices. S. Hackney, *Populism to Progressivism in Alabama* 147 (1969); C. Woodward, *Origins of the New South 1877–1913* 321 (1971).

In the judgment of modern scholars, the organizers of the 1901 Alabama convention sought to disfranchise poor dissident whites as well as blacks. M. McMillan, *Constitutional Development in Alabama, 1798–1901: A Study in Politics, the Negro, and Sectionalism* 249, 269 (1955) (Def.Exh. 14). With the ascendency of the Populists a decade earlier, the black vote had acquired added leverage. Whites, Democrats and Populists alike, vied for black ballots in any way they could, with favors, pardons of convictions, outright vote purchase and massive electoral fraud. *United States v. State of Alabama*, 252 F.Supp. 95, 98 (M.D.Ala.1966) (three-judge court); S. Hackney, *supra*, 36–37, 89, 176–77. As the court below noted, resort to such methods had become increasingly precarious in light of renewed Northern moves to extend the federal election supervisory act of 1870. In 1890 the Senate had narrowly defeated the Lodge force bill, which called for tighter federal control of all phases of voting, from voter registration to ballot tabulation. J. Kousser, *The Shaping of Southern Politics* 29–30 (1974); C. Woodward, *supra*, at 254–55. The most effective way to ward off federal intervention as well as fraud, according to the reformers, was to eliminate the Negro vote. S. Hackney, *supra*, at 146, 175–77; M. McMillan, *supra*, at 269; C. Woodward, *supra*, at 326–27. In the words of one delegate to the 1901 convention, "Now we are not begging for 'ballot reform' or anything of that sort, but we want to be relieved of purchasing the Negroes to carry elections. I want cheaper votes." Speech of Delegate William A. Handley, III *Official Proceedings of the Constitutional Convention of the State of Alabama, May*

---

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.[11]

[11] In *McGinnis v. Royster*, 410 U.S. 263, 276–277, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973), in a somewhat different context, we observed: "The search for legislative purpose is often elusive enough, *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), without a requirement that primacy be ascertained. Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute."

429 U.S. at 265 & n. 11, 97 S.Ct. at 563 & n. 11. In light of this passage, we conclude that *Arlington Heights* supercedes any dicta which *Palmer* might contain to the effect that a permissible purpose will always defeat an impermissible motive. *See also Washington v. Davis*, 426 U.S. at 242–43, 96 S.Ct. at 2048–49 (*Palmer* "did not involve, much less invalidate, a statute or ordinance having neutral purposes but disproportionate racial consequences"); Note, *Making the Violation Fit the Remedy: The Intent Standard and Equal Protection Law*, 92 Yale L.J. 328, 330 (1982).

*21st, 1901 to September 3rd, 1901* 2276–77 (1940) [hereinafter cited as *Official Proceedings*].

When the Alabama constitutional convention assembled in May 1901, the question was not whether to disfranchise the Negro but rather how to do so constitutionally. In his opening address John B. Knox, the president of the convention, declared:

> And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.

I *Official Proceedings* at 8; *see also Journal of the Proceedings of the Constitutional Convention of the State of Alabama* 1776 (1901). In Knox' words, "if we would have white supremacy, we must establish it by law—not by force or fraud." I *Official Proceedings* at 9. Borrowing from the successful methods of the Second Mississippi Plan and those of other states,[8] the suffrage committee set about to achieve this objective by settling on devices that would subvert the guarantees of the fourteenth and fifteenth amendments without directly provoking a legal challenge. In hopes of success, the committee made resort to facially neutral "tests that took advantage of differing social conditions. Property tests, literacy tests, residence requirements, the poll tax, and disqualification for conviction of certain crimes all fell into this category." S. Hackney, *supra*, at

192; *see also* Deposition of J. Morgan Kousser (Pl.Exh. 9).[9] The result was an exceptionally byzantine suffrage scheme. S. Hackney, *supra*, at 193; M. McMillan, *supra*, at 359.[10]

While there is scant record of the debates over section 182, the sources of the crimes selected for inclusion in and exclusion from section 182 shed light on the motives of its drafters. In enumerating the crimes that would trigger disfranchisement, the suffrage committee chose offenses that were "peculiar to the Negro's low economic and social status," such as petty property offenses, wife-beating and sex-related crimes. P. Lewinson, *Race, Class & Party* 81 & n. 7 (1963) (cited in Pl.Exh. 9); M. McMillan, *supra*, at 275 (Pl.Exh. 12). The crimes selected by the suffrage committee had their origin in an ordinance drafted and submitted by John Fielding Burns, a Black Belt planter. *See* I *Official Proceedings* at 511. According to Dr. McMillan:

> [t]he crimes [Burns] listed were those he had taken cognizance of for years in his justice of the peace court in the Burnsville district, where nearly all his cases involved Negroes. For example, among those [Burns would have] disfranchised were persons guilty of larceny, bigamy, seduction, incest, rape, or attempt to rape, burglary, or attempt to burglarize,

**8.** I *Official Proceedings* at 10–13; J. Kousser, *supra*, at 39–40, 189; M. McMillan, *supra*, at 272–75 (Pl.Exh. 12).

**9.** In 1898 the Supreme Court held that the Second Mississippi Plan passed muster under the fourteenth amendment. *Williams v. Mississippi*, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012 (1898). The Mississippi provisions included a poll tax and a literacy test coupled with an understanding clause as a loophole for poor whites. *Id.* at 217 n. 1, 18 S.Ct. at 585 n. 1.

As the district court noted, the Alabama proposal that the delegates feared was most vulnerable to constitutional attack was the temporary fighting grandfather clause, section 180. Under that clause veterans and their descendants automatically qualified to register until January 1, 1903, when a permanent provision imposing literacy and property restrictions, section 181, took effect. The Supreme Court later confirmed the delegates' fears when it invalidated a

similar Oklahoma grandfather clause. *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915). Adoption of facially neutral and severable measures such as section 182 was a critical line of defense in case other parts of the suffrage plan did not withstand attack. Deposition of J. Morgan Kousser.

**10.** Under the permanent plan which took effect on January 1, 1903, Ala. Const. art. VIII, § 181, citizens had to satisfy requirements of sex, age, residence, literacy and gainful employment or property ownership before they could register. *Id.* §§ 177–178, 181. Registered voters further had to pay a cumulative poll tax of $1.50 per year before they could cast a ballot. *Id.* §§ 178, 194. A three-judge court struck down the Alabama poll tax as violative of the fifteenth amendment in *United States v. Alabama*, 252 F.Supp. 95 (M.D.Ala.1966) (Rives, J.).

vagrancy, wife beating, forgery and "those who are bastards or loafers or who may be infected with any loathsome or contagious disease."

M. McMillan, *supra*, at 275 n. 76. In newspaper accounts, "Burns estimated the crime of wife-beating alone would disqualify sixty percent of the Negroes." J. Gross, *Alabama Politics and the Negro, 1874–1901* 244 (1969) (cited in Pl.Exh. 9).

According to experts for both sides, the evident racial animus of section 182 was used to induce delegates representing poor whites to vote for other provisions in the suffrage article, such as the poll tax, that were contrary to their interests. Whatever the folly of their vote, their perceptions of the disparate impact of section 182 turned out to be correct. The registrars' expert estimated that by January 1903 section 182 had disfranchised approximately ten times as many blacks as whites. This disparate effect persists today. In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under section 182 for the commission of nonprison offenses.[11]

■ In reviewing this record we are left with a firm and definite impression of error by the court below with respect to the issue of intent. Plaintiffs have more than shouldered their burden of showing that discriminatory intent was a motivating factor in the adoption of section 182; they have presented evidence from which the district court was required to find as a matter of law that discriminatory intent motivated section 182.[12] We therefore turn to the state's burden to demonstrate that the section would still have been adopted had a permissible state reason been the sole consideration.

The registrars rely on a purported state interest in denying the franchise to those convicted of violating its laws. Assuming without deciding that this asserted state interest would pass constitutional muster, we are unable to discern any evidence that the rule was actually intended to serve that interest. *Scheinberg v. Smith*, 659 F.2d 476, 483 n. 2 (5th Cir. Unit B 1981).

In the first place, we note several glaring omissions from the nonprison offenses resulting in disfranchisement under section 182.[13] While underinclusiveness in and of itself does not establish a discriminatory intent, once such intent is shown, underinclusiveness is relevant to whether a second, permissible purpose also motivated the drafters. Had the convention truly wished to vindicate a "good government" purpose, it would have included all crimes not punishable by imprisonment in the penitentiary. *Compare Trimble v. Gordon*, 430 U.S. 762, 768 n. 13, 97 S.Ct. 1459, 1464 n. 13, 52 L.Ed.2d 31 (1977); *O'Brien v. Skinner*, 414 U.S. 524, 530, 94 S.Ct. 740, 743, 38 L.Ed.2d

---

11. Because the registrars have not raised the issue whether blacks commit nonprison offenses generally in similarly disproportionate numbers, we do not reach that question.

12. In fact, the registrars concede the point in brief. They argue, however, that the first prong of *Arlington Heights* is not satisfied because the delegates also intended to deny suffrage to lower-class whites. This is an erroneous reading of the law. Under *Arlington Heights* plaintiffs need only show that racially discriminatory intent was *a* motivating factor behind the challenged legislation. Without question that was done here. The registrars do not advance the denial of the franchise to poor whites as a permissible purpose under the second prong of *Arlington Heights*.

13. In 1975, the year in which Underwood committed the offense for which he was convicted, nonprison offenses that were neither enumerated in section 182 nor involved moral turpitude and that thus were free from disability included: second-degree manslaughter (carrying a maximum sentence of 12 months and a maximum fine of $500); assault on a police officer (12 months; $1000); assault and battery (6 months; $500); mailing pornography (12 months; $2000); and aiding the escape of a misdemeanant (12 months; $1000). By contrast, Underwood, who was convicted for issuing a worthless $77.41 check, risked a maximum penalty of a $100 fine for a first offense. For repeated offenses, the most serious punishment authorized was a sentence of three months and a fine of $400.

702 (1974). Nothing in the convention proceedings or the constitution itself suggests a good government purpose. *See Trimble,* 430 U.S. at 768 & n. 13, 97 S.Ct. at 1464 n. 13; *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 641 n. 9, 94 S.Ct. 791, 797 n. 9, 39 L.Ed.2d 52 (1974); L. Tribe, *American Constitutional Law* § 12–8, at 602 & n. 1; *id.* § 16–30, at 1085–88 (1978). Indeed, while it is true that the avowed objective of the suffrage committee was to deny the vote to the corrupt and the ignorant, *see* I *Official Proceedings* at 1257, defendants' expert freely admitted under cross-examination that the phrase the "corrupt and the ignorant" referred specifically to blacks and lower-class whites. The same good government rationale, presented in defense of the Alabama poll tax, a sister provision to section 182, struck the late Judge Rives as nothing more than "ingenious afterthought." *United States v. Alabama,* 252 F.Supp. at 101. We hasten to agree and conclude that the registrars as a matter of law failed to present any evidence whatsoever of permissible intent. There was no evidence from which the district court could have found that section 182 would have been adopted had a permissible reason been the sole consideration.[14]

We recognize the registrars' good faith in administering the statute without reference to race. Neither their impartiality nor the passage of time, however, can render immune a purposefully discriminatory scheme whose invidious effects still reverberate today.

We hold that section 182 of the Alabama Constitution of 1901 violates on account of race the fourteenth amendment with respect to those convicted of crimes not punishable by imprisonment in the penitentiary. Since those provisions of section 182 that disfranchise nonprison offenders lack legal effect, *Dorchy v. Kansas,* 264 U.S. 286, 289–90, 44 S.Ct. 323, 324, 68 L.Ed. 686 (1924); *see INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 2775, 77 L.Ed.2d 317 (1983) (citing *Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 564–65, 76 L.Ed. 1062 (1932)), we do not reach the additional claims that plaintiffs press. The district court shall issue an injunction ordering voter registration upon request by members of plaintiff class who qualify in all other respects for registration on the electoral rolls.

REVERSED and REMANDED with instructions.

---

**14.** As evidence to the contrary, the state points to *Washington v. State,* 75 Ala. 582 (1884). In that case the Alabama Supreme Court announced in a racially neutral context that the state had the right to preserve the integrity of the vote by disfranchising those who had been convicted of crimes involving moral turpitude. *Id.* at 585. Before this court defendants argue that the holding of that case must have been the motivating force behind section 182 since most of the delegates to the 1901 convention were lawyers and presumably were aware of it. We agree with plaintiffs that this is too attenuated a causal link to prove that section 182, which swept in certain enumerated misdemeanors as well as crimes of moral turpitude, would have appeared in the same form absent racial motive. The decision preceded the convention by seventeen years. Significantly, defendants point to no passage in the proceedings or in the committee report accompanying section 182 that invoked *Washington v. State* as authority for the suffrage provision. As we admonished in *Scheinberg,* 659 F.2d at 483 n. 2, it is improper for us to speculate as to any permissible state purposes that might exist when fundamental rights or the rights of a suspect class are at stake. For the same reason, we cannot give credence to the state's argument that the 1901 expansion of the disabling crimes listed in the 1875 Alabama Constitution demonstrates an affirmation of what the state assumes was the good government purpose of the Redemption-era provision.